56 P.3d 692

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Gordon J. CORDEIRO, Defendant–Appellant.**

No. 22065.

Supreme Court of Hawai'i.

Oct. 7, 2002.

Reconsideration Denied Nov. 6, 2002.

396

Dwight C.H. Lum, Honolulu, on the briefs, for the defendant-appellant, Gordon J. Cordeiro.

Simone C. Polak (Deputy Prosecuting Attorney), on the briefs, for the plaintiff-appellee, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge McKENNA, assigned by reason of vacancy; and NAKAYAMA, J., concurring separately, and with whom RAMIL, J., joins.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Gordon J. Cordeiro appeals, in connection with Cr. No. 94–0522(3), from the judgment of the second circuit court, the Honorable Boyd P. Mossman presiding, convicting him of and sentencing him for the offenses of murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5 (1993),[1] robbery in the first degree, in violation of HRS § 708–840 (1993),[2] and prohibited place to keep firearm, in violation of HRS § 134–6 (Supp.1997),[3] and, in connection with Cr. No. 97–0073(3), from the same judgment convicting him of and sentencing him for the offense of attempted murder in the first degree, in violation of HRS §§ 705–500 (1993)[4] and 707–701(1)(d) (1993).[5] Cordeiro raises a plethora of points of error on appeal, *see infra* section I.B. In summary, we hold that the circuit court plainly erred in its jury instructions regarding the charge of first degree robbery and, accordingly, we vacate Cordeiro's conviction of and sentence for first degree robbery and remand for further proceedings consistent with this opinion. In all other respects, we affirm the circuit court's judgment of conviction and sentence.

## I. BACKGROUND

Inasmuch as the present appeal directly involves five criminal proceedings, implicates a sixth, and concerns two trials, we believe it expedient, in this section, to provide a short procedural synopsis, summarize each of Cordeiro's numerous points of error, and briefly sketch the factual background giving rise to the various charges. We discuss the facts germane to each of Cordeiro's points of error more fully *infra* in section III.

### A. Procedural Synopsis

On October 24, 1994, a grand jury returned an indictment against Cordeiro in Cr. No. 94–0522 (hereinafter, "the Blaisdell case"), charging him with robbing and murdering Timothy Blaisdell, kidnapping Michael Freitas, and committing two firearms-related offenses, all on August 11, 1994.[6] The mat-

---

1. HRS § 707–701.5 provides in relevant part that, "[e]xcept as provided in [HRS § ] 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

2. HRS § 708–840(1)(b)(i) provides in relevant part: "A person commits the offense of robbery in the first degree if, in the course of committing theft[,] ... [t]he person is armed with a dangerous instrument and ... [t]he person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance[.]" "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft, in the commission of theft, or in the flight after the attempt or commission." HRS § 708–842 (1993). Pursuant to HRS § 708–840(2), " 'dangerous instrument' means any firearm[.]" "Theft" is statutorily defined and is committed if, *inter alia*, "[a] person obtains, or exerts control over, the property of another with intent to deprive the other of the property." HRS § 708–830(1) (1993).

3. HRS § 134–6(c) provides in relevant part that "all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn," except under certain conditions.

4. HRS § 705–500 provides in relevant part:

 (1) A person is guilty of an attempt to commit a crime if the person:

 (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

 (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

 (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

 (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

5. HRS § 707–701(1) provides in relevant part that "[a] person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of ... [a] person by a hired killer, in which event both the person hired and the person responsible for hiring the killer shall be punished under this section[.]"

6. Count 1 of the indictment in the Blaisdell case charged Cordeiro with the offense of second de-

ter proceeded to trial in May 1995, resulting in a hung jury on all counts, and the circuit court declared a mistrial.

On May 19, 1995, while Cordeiro was being tried for the first time in the Blaisdell case, a grand jury indicted him in connection with several drug related offenses (hereinafter, "the drug case"). After the circuit court declared a mistrial in the Blaisdell case, the prosecution moved to consolidate the drug case with the Blaisdell case, but the circuit court denied the prosecution's motion.

Subsequently, while Cordeiro awaited retrial in the Blaisdell case, he was indicted in four other matters, all for attempted first degree murder, *see supra* notes 4 and 5. In Cr. No. 97–0073 (hereinafter, "the Iona case"), Cordeiro was accused of hiring John K. Iona in March 1995 to kill Freitas, who was the prosecution's only eyewitness to the murder with which Cordeiro was charged in the Blaisdell case. In Cr. No. 95–0503 (hereinafter, "the Cornelio case"), Cordeiro was accused of hiring William Cornelio in June 1995 to kill Freitas. A third indictment, returned in Cr. No. 96–0310 (hereinafter, "the Kekona case"), accused Cordeiro of hiring Anthony Kekona sometime in the fall of 1995 to kill Cornelio. And, finally, a fourth indictment, Cr. No. 98–0149 (hereinafter, "the Kapika case"), accused Cordeiro of hiring Nedric R. Kapika in January 1998 to kill Freitas. In each of these matters (hereinafter, collectively, "the attempted first degree murder cases"), the prosecution moved for, defense counsel did not object to, and the circuit court granted consolidation with the Blaisdell case.

However, prior to trial, the circuit court dismissed the Kekona case (in which Cornelio

was the alleged victim) without prejudice. Thereafter, the consolidated matter—now comprised of the Blaisdell, Cornelio, Iona, and Kapika cases—proceeded to trial in June 1998. On August 10, 1998, the jury acquitted Cordeiro of attempted first degree murder in connection with the Kapika and Cornelio cases. However, the jury convicted Cordeiro of attempted first degree murder, as charged, in the Iona case. In connection with the Blaisdell case, the jury acquitted Cordeiro of the offense of kidnapping but convicted him of second degree murder, first degree robbery, and the two firearms-related offenses.[7]

### B. Cordeiro's Points Of Error

Cordeiro's first and second points of error challenge his first degree robbery conviction in connection with the Blaisdell case. First, Cordeiro asserts that the indictment in the Blaisdell case failed to expressly name either the victim of the theft or the person against whom Cordeiro used force. Because he raises the issue for the first time on appeal, Cordeiro urges this court to recognize the alleged defect as plain error, warranting reversal of his first degree robbery conviction. Second, Cordeiro urges that the circuit court plainly erred in failing to instruct the jury (1) that "it must [unanimously] find that one or more specifically named persons was a victim of the theft," (2) that the "victim's awareness of the theft is a necessary element of first degree robbery," and (3) that the jury could "find [Cordeiro] guilty only of the murder [of Blaisdell] if [it] determined that [Cordeiro] committed that offense concurrently with the robbery [offense]."

gree murder, in violation of HRS § 707–701.5, *see supra* note 1; count 2 charged him with prohibited place to keep a firearm, in violation of HRS § 134–6(c), *see supra* note 3; count 3 charged him with kidnapping, in violation of HRS § 707–720(1)(c) (1993) ("A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to ... [f]acilitate the commission of a felony or flight thereafter[.]"); count 4 charged him with first degree robbery, in violation of HRS § 708–840(1)(b)(i), *see supra* note 2; and count 5 charged him with carrying or use of a firearm in the commission of a separate felony, in violation of HRS § 134–6(a) (Supp.1997) ("It

shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony," except under certain conditions.).

7. The circuit court, however, subsequently dismissed Cordeiro's conviction of using a firearm in the commission of a separate felony, in violation of HRS § 134–6(a), *see supra* note 6, pursuant to this court's holding in *State v. Jumila*, 87 Hawai'i 1, 950 P.2d 1201 (1998).

Cordeiro's third point is that the circuit court plainly erred in consolidating the Cornelio, Iona, and Kapika cases with the Blaisdell case; accordingly, Cordeiro urges this court to vacate all of his convictions and remand for separate trials in the Blaisdell and Iona cases.

Cordeiro's remaining points of error beseech this court to vacate all of his convictions and remand for a new trial. His fourth point is that the circuit court: (1) erred, over his objection, in admitting (a) evidence of Cordeiro's involvement with illegal drugs and (b) testimony regarding a threat that he allegedly directed against a witness; and (2) plainly erred in instructing the jury with regard to the purpose for which it could consider such "other bad acts" evidence (Cordeiro not having objected to the instruction at trial). Cordeiro's fifth point is that the circuit court erred in allowing Anthony Mamoukian, M.D., a pathologist who testified for the prosecution, to render an opinion regarding the trajectory of the bullet that killed Blaisdell; according to Cordeiro, Dr. Mamoukian was not qualified as a "homicide reconstruction expert." As his sixth point, Cordeiro argues that the circuit court erred in precluding him from calling Wayne Hill, a purported "homicide reconstruction expert," as a witness. By doing so, Cordeiro contends that the circuit court violated "his constitutional right to present a complete defense." In his seventh point, Cordeiro argues that, in limiting his cross-examination of various witnesses, the circuit court violated his constitutional right to confrontation. In his eighth point, Cordeiro claims that the circuit court erred in allowing the prosecution, over his objection, to adduce Cornelio's testimony regarding his religious beliefs; Cordeiro asserts that such testimony was simply "a way to bolster [Cornelio's] credibility," in violation of Hawai'i Rules of Evidence (HRE) Rule 610 (1998). Cordeiro's ninth point is that the circuit court erred in denying his motion for a new trial; according to Cordeiro, the prosecution knowingly adduced perjured testimony. Cordeiro's tenth point of error is a

prosecutorial misconduct claim. Cordeiro argues: (1) that the two deputy prosecuting attorneys (DPAs) "work[ed] in tandem" during his trial to "harass" his counsel; (2) that the prosecution made frivolous objections for the purpose of interrupting the defense counsel's cross-examination; (3) that, in closing argument, the DPA "constantly referr[ed] to [Cordeiro] as a liar and personally vouch[ed] for [the prosecution's] witnesses"; and (4) that the cumulative effect of the foregoing conduct deprived Cordeiro of a fair trial.[8] Consequently, Cordeiro argues that the circuit court erred in denying his two motions for a mistrial. Cordeiro's eleventh and final point of error is an ineffective assistance of counsel claim, which he fashions from a number of his other points. Cordeiro argues that he was denied the effective assistance of counsel by virtue of defense counsel's failure (1) to object to the prosecution's joinder motions, (2) to file a motion to dismiss the allegedly defective robbery count in the Blaisdell indictment, (3) to object to the circuit court's first degree robbery instruction, (4) "to move for prompt limiting instructions" in connection with the "other bad acts" evidence, and (5) adequately to investigate an allegation that the prosecution knowingly introduced perjured testimony.

### C. *Factual Background*

The present matter arises from the murder of Timothy Blaisdell on August 11, 1994, which occurred in the course of his attempt to purchase a pound of marijuana, and the subsequent efforts by Cordeiro to evade prosecution and conviction for the crime by eliminating the only eyewitness to the murder, Michael Freitas. The following evidence was adduced at Cordeiro's second trial, in July and August of 1998, in connection with Blaisdell's murder.

### 1. *The Blaisdell case*

During the summer of 1994, Blaisdell was living with his parents in Makawao, Maui and

---

**8.** Cordeiro does not assert that the alleged prosecutorial misconduct in this case was so egregious as to bar reprosecution.

working at Kaya's Collision and Repair, an automobile repair shop. In late July, Blaisdell met Freitas, who was acquainted with Blaisdell through a cousin, at Freitas's house in Pukalani, Maui, for the purpose of examining some damage to Freitas's jeep, which had recently "flipped." During their meeting, Freitas offered Blaisdell some marijuana to smoke and, while they were smoking, Blaisdell mentioned to Freitas that he wanted to purchase some. Freitas offered to assist Blaisdell by making a few telephone calls, but no specific arrangements were made.

Blaisdell had stated to several people around this time that he was trying to purchase a pound of marijuana for $800.00. Kenneth Tanouye, Blaisdell's friend and co-worker, was supposed to supply the money, and the two planned to divide the marijuana between them. In fact, approximately one week prior to Blaisdell's murder, Tanouye had given him $800.00 in cash for a purchase, but the transaction had never taken place, and Blaisdell had returned the money.

On August 10, 1994, or thereabouts, Blaisdell and Freitas met by chance in front of the house of Freitas's girlfriend, who lived across the street from Blaisdell. Blaisdell asked Freitas whether he had been able to secure any marijuana, and Freitas told him that he knew how Blaisdell could obtain a pound of "seeded" marijuana for $800.00. But, on the morning of August 11, 1994, Freitas telephoned Blaisdell at work and informed him that he had not been able to contact his source; nevertheless, he instructed Blaisdell to call him after work. Blaisdell subsequently stated to Tanouye that he was going to attempt to purchase marijuana that night, and Tanouye once again gave Blaisdell $800.00 in cash. Blaisdell never revealed to Tanouye the identity of his source, but he did mention that he was going to meet with Freitas.

Blaisdell telephoned Freitas at approximately 4:20 p.m. to follow up on their earlier conversation, but Freitas advised Blaisdell that he had been unable to contact his source and that he was going to be busy that evening. Nevertheless, when Blaisdell left his house at approximately 4:45 p.m., he told his uncle, Donald Moor, that he was going to purchase a pound of marijuana for $800.00 and displayed a roll of money. Moor urged Blaisdell to be careful, and Blaisdell assured his uncle that "[i]t is okay. I am with [Freitas]." Blaisdell left with a backpack and proceeded up the street on foot, leaving his car behind.

Shortly thereafter, Freitas observed Blaisdell in front of his house smoking a cigarette; Freitas was himself on his way to his girlfriend's house at the time. Blaisdell asked Freitas for a ride and, after Freitas determined that his girlfriend was not at home, he agreed to do so, although he subsequently claimed that he was not then aware of Blaisdell's intended destination. Blaisdell directed Freitas to an area of Pukalani known as "skid row," at which Blaisdell instructed Freitas to park alongside the road.

After approximately fifteen minutes, a truck, which Freitas recognized as belonging to Shane Shirota, pulled up and parked in front of Freitas's vehicle. Blaisdell exited Freitas's vehicle with his backpack in his hand, approached the passenger's side of the truck, and began speaking with the occupant of the vehicle through the window of the passenger's side door. Meanwhile, Freitas, who remained in his vehicle, decided to smoke a cigarette; at the moment he looked down to activate his car lighter, he heard a gunshot. He then observed Blaisdell lying by the side of the road, his head bleeding.

Freitas attempted to start the engine of his vehicle, but before he could do so, Cordeiro, who Freitas recognized from high school, ran up to him with a gun pointed at his head. Cordeiro ordered Freitas out of the truck and instructed him to carry Blaisdell's body into a gulch by the side of the road and to cover the body with some rubbish, including an E–Z Glider exercise machine, which was laying nearby. While Freitas was complying, Cordeiro warned him, "Don't say anything or I'll hurt your family and friends." After Freitas finished covering Blaisdell's body, Cordeiro again threatened Freitas, but ultimately allowed him to leave. As Freitas drove away in his vehicle, he noticed Blaisdell's hat, glasses, and backpack lying in the roadway. Freitas did not speak to anyone about the murder for some time.

Blaisdell's body was discovered at approximately 9:00 p.m. on August 11, 1994 and Anthony Manoukian, M.D., a pathologist at Maui Memorial Hospital, examined Blaisdell's body during the morning of August 12, 1994. From his initial observation of the lividity and rigor mortis present in Blaisdell's body, Dr. Manoukian estimated that Blaisdell had been dead sometime between four and twenty-four hours. Dr. Manoukian performed an autopsy on August 13, 1994 and determined that Blaisdell died as a result of a gunshot wound to the right side of the head. Based on the gun powder residue on Blaisdell's face, Dr. Monoukian estimated that the barrel of the murder weapon had been fired from a distance of between six and twenty-four inches. He also determined that, after entering the right side of Blaisdell's head, the bullet had traveled downward and to the left.

On August 13, 1994, Maui Police Department (MPD) Detective Richard Camara questioned Freitas regarding Blaisdell's death, but Freitas denied that he had been in Blaisdell's presence on the day in question. Shortly thereafter, however, Freitas did disclose to Dave Shevling, a co-worker, "who[,] more or less[,] was at the scene."

On September 12, 1994, an unidentified male fired a weapon at Freitas while he was driving in his truck, shattering the rear window. Freitas reported the incident to the MPD the next day, but still did not reveal any information about Blaisdell's murder. Nevertheless, Freitas feared that Cordeiro was attempting to kill him and decided to tell his sister-in-law, Lynette Sakamura, about Blaisdell's death. On October 16, 1994, Freitas disclosed to Sakamura what he had witnessed on August 11, 1994 and sought her advice. Sakamura urged Freitas to tell his parents, which he subsequently did, and they promptly hired an attorney for him. Finally, on October 19, 1994, Freitas gave a formal statement to Detective Camara regarding Blaisdell's murder on August 11, 1994.

The police obtained a warrant to search Cordeiro's residence but were unable to discover any evidence linking Cordeiro to Blaisdell's death. In addition, the police obtained a warrant to search Shirota's truck. Adhesive lifts from Shirota's truck uncovered particles that were consistent with, though not unique to, the discharge from a firearm. The police never succeeded in recovering the murder weapon or the $800.00 in cash that Blaisdell allegedly had in his possession when he was killed.

On October 21, 1994, Cordeiro was indicted in connection with Blaisdell's murder.

### 2. The attempted first degree murder cases

On May 17, 1995, during Cordeiro's first trial in the Blaisdell case, John Iona, an inmate at the Maui Community Correctional Center (MCCC), where Cordeiro had been held after his arrest, told the MPD that Cordeiro had discussed the Blaisdell murder with him. Iona and Cordeiro had met during the summer of 1994, prior to their incarceration, through their involvement in the sale of crystal methamphetamine. Around the end of 1994 or beginning of 1995, while Iona and Cordeiro were both incarcerated in the MCCC, Cordeiro related to Iona details regarding Blaisdell's murder and the importance of Freitas's testimony to the prosecution. Cordeiro asked Iona, who was planning to escape from the MCCC, to kill Freitas if he was able get out; Cordeiro gave Iona three maps containing the information necessary to locate Freitas. Cordeiro advised Iona that he was going to inherit some money and would assist Iona in the event that Iona killed Freitas, although Cordeiro never specified exactly how he would assist Iona or whether he would pay Iona a certain sum of money.

Iona lost interest in murdering Freitas, however, after learning from William Cornelio, another MCCC inmate, that Cordeiro had also asked Cornelio to murder Freitas. Moreover, Iona subsequently learned that Cordeiro had provided his cellmate with certain information, which Iona had shared with Cordeiro, regarding Iona's own criminal case; consequently, Iona no longer trusted Cordeiro.

In October 1995, while Cordeiro was awaiting his second trial in the Blaisdell case, Cornelio contacted the police regarding Cor-

deiro's alleged attempt to hire him to kill Freitas. Cornelio claimed that Cordeiro had told him that Freitas was the only eyewitness against Cordeiro in his murder case. Cornelio further stated that, when Cordeiro heard that he was planning to escape with Iona, Cordeiro told Cornelio that he would pay him $5,000.00 in the event that he killed Freitas. The escape never took place, but Cornelio claimed that Cordeiro signed a contract stating that Cordeiro's grandmother would pay Cornelio $5,000.00 if he was able to get out of the MCCC by other means and kill Freitas prior to Cordeiro's second trial.

In January 1998, a third MCCC inmate, Nedric Kapika, approached the prosecutor's office claiming that Cordeiro had attempted to hire him to murder Freitas. In contrast to Cornelio and Iona, Kapika's recollection of what Cordeiro had said regarding the Blaisdell murder was remarkably detailed and similar to the prosecution's theory of the case. According to Kapika, Cordeiro had recounted the details of Blaisdell's murder while they were working in the MCCC computer lab, and Kapika had inputted what Cordeiro had told him nearly verbatim into his computer.[9]

### 3. Cordeiro's second trial

The principal evidence introduced by the prosecution against Cordeiro at his second trial was Freitas's eyewitness testimony. Freitas's testimony was corroborated, *inter alia*, by (1) the testimony of witnesses who were either aware that Freitas was attempting to assist Blaisdell in purchasing marijuana or had observed the two together on their way to "skid row," (2) latent fingerprints, which partially matched Freitas's, on the E-Z Glider exercise machine, and (3) Dr. Manoukian's testimony regarding the gunshot wound that killed Blaisdell.

The prosecution was never able to establish, by direct evidence, that Blaisdell had

arranged to purchase a pound of marijuana from Cordeiro, but it did succeed in introducing evidence showing that Cordeiro was widely known, including by Blaisdell, to use and sell illegal drugs and, therefore, according to the prosecution's theory, to be someone whom Blaisdell would be likely to contact were he seeking to purchase marijuana.

Cordeiro denied murdering Blaisdell or even being present at the scene of the murder. He testified that, on the afternoon of August 11, 1994, he and a friend, Curtis Diment, had driven Diment's truck to Makawao Feed and Lumber to pick up some lumber, with which Cordeiro planned to build some shelves in his garage. They purchased the lumber around 4:00 p.m. and returned to Cordeiro's house, where Cordeiro insisted that he had remained for the rest of the evening, eating pizza and constructing shelves for his garage.

Diment testified that he had departed Cordeiro's house after the two had unloaded the lumber, but that Derek Sakoda was present when he left. Sakoda testified that he was present at Cordeiro's residence when Cordeiro and Diment had returned from the lumber shop and had assisted them in unloading the lumber from Diment's truck. Sakoda did not remember whether he had taken a break to eat, but he admitted that, during Cordeiro's first trial, he had testified that he had not done so. He remembered leaving Cordeiro's house at approximately 8:30 p.m., but conceded that his memory of the events of August 11, 1994 was "kind of foggy." Shawn Takahashi testified that he had been present at Cordeiro's house on August 11, 1994 between approximately 5:30 to 5:45 p.m. and 9:30 to 9:45 p.m. He recalled observing Cordeiro construct shelves and working on his dirt bike, although he admitted that Cordeiro was not in his presence the entire time.[10]

---

9. Kapika claimed that he used a computer program that showed stars on the monitor in place of letters, so that Cordeiro was unaware of Kapika's "dictation." Lee Gerrick, the educational program supervisor at the MCCC, however, testified that the MCCC computers contained no such program.

10. John Freitas, Michael Freitas's father, testified that, on August 3, 1998, while he was sitting

outside the courtroom, Takahashi had exited the courtroom and had approached Sakoda. John Freitas allegedly overheard Takahashi ask Sakoda, "How long were Gordon gone?" Sakoda allegedly responded, "How the fuck should I know? It wasn't my turn to babysit him." Neither Takahashi or Sakoda were apparently aware that John Freitas was Michael Freitas's father. When the prosecution confronted Sakoda with

Cordeiro's sister, Denise, testified that she had arrived at the Cordeiro residence at around 5:00 p.m. and recalled observing Cordeiro, Sakoda, and a friend (Hank DeCoite), lounging around the house. She did not recall seeing Cordiero leave the garage area, though she was not in his presence the entire evening.

Cordeiro admitted that he was aware that Shirota, who lived across the street from him, habitually kept the keys to his truck in its ignition and that he had borrowed Shirota's truck from time to time, but denied borrowing Shirota's truck at any time during 1994. He estimated that only a few minutes were required to drive from his house to "skid row."

Cordeiro also denied that he had ever attempted to hire anyone to kill Freitas. Indeed, Cordeiro denied ever discussing his case with anyone incarcerated at the MCCC. He did testify, however, that, during November 1994, when his attorney sent him three hundred pages of police reports and discovery material to review, the envelope had been unsealed when he had received the material at the MCCC. Apparently, it had been mistakenly delivered to Brian Cordeiro, another MCCC inmate, who stated to Cordeiro that both he and his roommate had read the reports.

## II. STANDARDS OF REVIEW

### A. Sufficiency Of A Charge

■ " 'Whether an indictment [or complaint] sets forth all the essential elements of [a charged] offense . . . is a question of law,' which we review under the de novo, or 'right/wrong,' standard." State v. Merino, 81 Hawai'i 198, 212, 915 P.2d 672, 686 (1996) (quoting State v. Wells, 78 Hawai'i 373, 379, 894 P.2d 70, 76 (1995) (citations omitted)).

### B. Jury Instructions

■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insuf-

ficient, erroneous, inconsistent, or misleading. . . .

[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that the error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. . . .

State v. Valentine, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (citations and internal quotation signals omitted) (brackets in original).

State v. Valdivia, 95 Hawai'i 465, 471–72, 24 P.3d 661, 667–68 (2001).

### C. Consolidation Of Multiple Charges In A Single Trial

■ "On appeal, a trial court's order consolidating cases for trial under [Hawai'i Rules of Penal Procedure (HRPP) ] Rule 13 shall not be disturbed absent an abuse of discretion." In re John Doe, Born on October 26, 1977, 79 Hawai'i 265, 273, 900 P.2d 1332, 1340 (App.1995) (citations omitted). Cf. State v. Renon, 73 Haw. 23, 31, 828 P.2d 1266, 1270 (1992) ("We review the [circuit] court's decision to join defendants in a single trial for an abuse of discretion.")

### D. The Admissibility Of Evidence

■ The admissibility of evidence requires different standards of review depending on the particular rule of evidence

his statement during cross-examination, Sakoda responded, "Where you getting your story from? You spying on me out there? . . . . I didn't say it.

I don't remember. I don't even care, because I wasn't even paying attention if he did ask me that."

at issue. *State v. Pulse,* 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996).

> When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Id.* at 246–47, 925 P.2d at 814–15 (citations omitted).

"Prior bad act" evidence under Hawai'i Rules of Evidence (HRE) Rule 404(b) (1993) is admissible when "it is 1) relevant and 2) more probative than prejudicial." *State v. Maelega,* 80 Hawai'i 172, 183, 907 P.2d 758, 769 (1995) (citations omitted). A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 (1993) is reviewed under the right/wrong standard of review. *State v. Pulse,* 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996). However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993) is reviewed for abuse of discretion. *See id.* An abuse of discretion occurs when the court "clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant." *State v. Furutani,* 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations omitted).

*State v. Torres,* 85 Hawai'i 417, 421, 945 P.2d 849, 853 (App.1997) (footnotes omitted).

 We review the circuit court's decision to admit expert testimony for abuse of discretion. *See State v. Vliet,* 95 Hawai'i 94, 107, 19 P.3d 42, 55 (2001); *State v. Fukusaku,* 85 Hawai'i 462, 496, 946 P.2d 32, 66 (1997); *State v. Maelega,* 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995); *State v. Montalbo,* 73 Haw. 130, 140–41, 828 P.2d 1274, 1281 (1992).

> [T]he question whether a person is an expert is a question of law. The person either is or is not an expert, and there is only one right answer. However, . . .

> [t]he question of whether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion.

> . . . .

> Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert "should not be required to satisfy an overly narrow test of his own qualifications." The trial court has wide discretion in determining the competency of a witness as an expert with respect to a particular subject.

*State v. Cababag,* 9 Haw.App. 496, 504, 850 P.2d 716, 720 (1993) (citing *Larsen v. State Sav. & Loan Ass'n,* 64 Haw. 302, 304, 640 P.2d 286, 288 (1982), and M. Graham, *Federal Practice and Procedure: Evidence* § 6642 (Interim Ed.1992)).

### E. *Limitations On Cross-Examinations*

 The law is settled that

> the scope of cross-examination at trial [is] . . . within the discretion of the trial court. . . . The trial court's exercise of its discretion to limit the scope of cross-examination will not be ruled as reversible error when it limits irrelevant and repetitious questions by counsel [and the limitation does] not result in any manifest prejudice to the defendant.

*State v. Okumura,* 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995) (quoting *State v. Young,* 8 Haw.App. 145, 151, 795 P.2d 285, 290 (quoting *State v. Faulkner,* 1 Haw.App. 651, 654–55, 624 P.2d 940, 943–44 (1981)), *cert. denied,* 71 Haw. 669, 833 P.2d 901 (1990)) (some brackets and ellipses added and some in original).

### F. *The Circuit Court's Denial Of A Motion For New Trial*

The trial judge, at a hearing on a motion for new trial, acts as the trier of fact. *Martinez v. State,* 846 S.W.2d 348, 349 (Tex.App.1992). In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. *State v. Hutch,* 75 Haw. 307, 328, 861 P.2d 11, 22 (1993) (citations omitted).

"An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Id.* (citations and internal quotation marks omitted); *see also State v. Batson,* 73 Haw. 236, 246, 831 P.2d 924, 930, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992). And

[w]here there is substantial evidence, which is credible evidence of sufficient quantity and probative value to justify a reasonable person in reaching conclusions that support the FOFs, the FOFs cannot be set aside. Moreover, an appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence; this is the province of the trial judge.

*Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 116–17, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992) (citations and internal quotation marks omitted).

*State v. Furutani,* 76 Hawai'i 172, 179–80, 873 P.2d 51, 58–59 (1994).

### G. *Denial Of A Motion For Mistrial*

 "The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion." *State v. Rogan,* 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999) (citing *State v. Loa,* 83 Hawai'i 335, 349, 926 P.2d 1258, 1272, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996)).

### H. *Ineffective Assistance Of Counsel*

 In reviewing an ineffective assistance of counsel claim, this court must determine whether the assistance, "[w]hen viewed as a whole, was ... provided to the defendant within the range of competence demanded of attorneys in criminal cases[.]" *State v. Richie,* 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998) (citations and internal quotation marks omitted). In addition,

[t]his court has also held that

the defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*Id.* (quoting *State v. Silva,* 75 Haw. 419, 439–40, 864 P.2d 583, 593 (1993)). "Determining whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker.... Accordingly, no showing of 'actual' prejudice is required to prove ineffective assistance of counsel." *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994).

*State v. Fukusaku,* 85 Hawai'i 462, 479–80, 946 P.2d 32, 49–50 (1997) (ellipsis in original).

*Barnett v. State,* 91 Hawai'i 20, 26–27, 979 P.2d 1046, 1052–53 (1999) (brackets and ellipsis points in original).

### I. *Plain Error*

 " 'We may recognize plain error when the error committed affects substantial rights of the defendant.' " *State v. Jenkins,* 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (quoting *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)). *See also* HRPP Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

## III. *DISCUSSION*

### A. *Although The First Degree Robbery Charge Was Not Fatally Defective, The Circuit Court Plainly Erred In Instructing The Jury In Connection With That Offense In Two Respects.*

Cordeiro argues that his conviction of and sentence for robbery in the first degree, pursuant to HRS § 708–840(1)(b)(i), *see supra* note 2, must be reversed because: (1) the indictment charging him with first degree robbery failed expressly to name (a) the person against whom force was used and (b) the person who was the victim of the theft; and, alternatively, (2) that the circuit court

erred in instructing the jury in connection with the robbery charge. Because he did not raise either issue at trial, Cordeiro urges this court to invoke the doctrine of plain error.

The prosecution contends that count four of the Blaisdell indictment sufficiently alleged the offense of first degree robbery but concedes that "the robbery conviction should be vacated due to inadequate jury instructions." We agree.

1. *Count 4 of the indictment in the Blaisdell case is not fatally defective.*

 When a defendant fails to challenge the sufficiency of a charge in the trial court and, instead, invokes plain error to challenge that charge for the first time on appeal,

> our review is governed by the rule that " '[charges] which are tardily challenged [after conviction] are liberally construed in favor of validity.' " *State v. Motta*, 66 Haw. 89, 91, 657 P.2d 1019, 1020 (1983)[.] ... The "liberal construction standard for post-conviction challenges to [a charge] means we will not reverse a conviction based upon a defective [charge] unless the defendant can show prejudice or that the [charge] cannot within reason be construed to charge a crime." [*Id.*] at 91, 657 P.2d at 1020.

*[State v. Elliot*, 77] Hawai'i [314, 316], 884 P.2d [377,] 379 [ (App.1994) ],

*State v. Elliott*, 77 Hawai'i 309, 311, 884 P.2d 372, 374 (1994) (some internal citations omitted) (some brackets added and some in original); *see also State v. Merino*, 81 Hawai'i 198, 212, 915 P.2d 672, 686 (1996); *State v. Smith*, 66 Haw. 95, 657 P.2d 1022 (1983). Generally speaking, a charge drawn from the language of the statute proscribing the offense is not fatally defective. *See State v. Israel*, 78 Hawai'i 66, 73, 890 P.2d 303, 310 (1995); *State v. Jendrusch*, 58 Haw. 279, 282, 567 P.2d 1242, 1245 (1977); *State v. Tuua*, 3 Haw.App. 287, 293, 649 P.2d 1180, 1184–85 (1982).

As we have already noted, *see supra* note 2, at the time Cordeiro allegedly committed first degree robbery, HRS § 708–840(1)(b)(i) provided in relevant part that "[a] person commits the offense of robbery in the first degree if, in the course of committing theft ..., [t]he person is armed with a dangerous instrument and ... [t]he person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance[.]"

Count 4 of the Blaisdell indictment tracked this statutory language nearly verbatim, alleging that

> on or about the 11th day of August, 1994, in the County of Maui, State of Hawai'i, GORDON J. CORDEIRO, in the course of committing theft and while armed with a dangerous instrument, to wit, a revolver, did use force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance, thereby committing the offense of Robbery in the First Degree in violation of Section 708–840(1)(b)(i) of the Hawai'i Revised Statutes.

Thus, this is not a case in which the charge "cannot within reason be construed to charge a crime."

 Nor does the record reflect that Cordeiro was prejudiced by the charge's failure to name the person against whom he allegedly used force or the victim of the theft. At no point did Cordeiro file a motion for a bill of particulars. Indeed, his alibi defense—*i.e.*, that he was not at the scene of the incident at all—was in no way affected by the charge's lack of specificity in these respects. *Cf. State v. Smith*, 66 Haw. 95, 657 P.2d 1022 (holding that an indictment for second degree robbery that failed to specify that the person against whom force was used was physically present or the owner of the property was not plain error, because, *inter alia*, there was no doubt that that was what the prosecution was alleging).[11]

Accordingly, we hold that the failure of count 4 of the Blaisdell indictment either to

11. The prosecution improperly argued to the jury, in the absence of a specific unanimity instruction, that it could convict Cordeiro by finding that he used force against either Blaisdell or, alternatively, Freitas. While erroneous, *see infra* section III.B.2, the prosecution's argument was a function of the circuit court's faulty jury instructions, rather than any defect in the charge.

name the person against whom Cordeiro allegedly used force or the victim of the theft did not render the charge fatally defective in this case.

2. *The circuit court's jury instructions regarding the offense of first degree robbery were prejudicially erroneous.*

In connection with the first degree robbery charge, the prosecution argued to the jury that, in finding that Cordeiro "used force against the person of anyone present . . . to overcome that person's physical resistance or physical power of resistance," "the person of anyone present could be either Michael Freitas or it could be Tim Blaisdell himself." The circuit court, for its part, did not instruct the jury that it was required unanimously to agree as to the identity of the person against whom Cordeiro used force. Rather, the circuit court generally instructed the jury that its "verdict must be unanimous" and, with respect to first degree robbery, instructed the jury as follows:

> In Count 4 of the indictment, the Defendant, Gordon J. Cordeiro, is charged with the offense of robbery in the first degree. A person commits the offense of robbery in the first degree if, in the course of committing theft, he is armed with a dangerous instrument and he uses force against the person of anyone present with intent to overcome the person's physical resistance or physical power of resistance.

> There are three material elements of the offense of robbery in the first degree, each of which the prosecution must prove beyond a reasonable doubt. These three elements are: one, that on or about the 11th day of August, 1994, in the County of Maui, State of Hawai'i, the Defendant was in the course of committing theft; and two, that while doing so, the Defendant was armed with a dangerous instrument; and three, that while doing so, the Defendant used force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance.

The circuit court then instructed the jury regarding the statutory definitions of "theft," "in the course of committing theft," and

"dangerous instrument." Cordeiro argues that the circuit court plainly erred in three respects in giving the foregoing instructions.

a. *The circuit court plainly erred in failing to instruct the jury that it was required to agree unanimously as to the person against whom Cordeiro used force.*

First, Cordeiro argues that the circuit court plainly erred in failing to give a specific unanimity instruction, *i.e.*, in failing to instruct the jury that it was required to agree unanimously as to the identity of the person against whom he used force—either Blaisdell or Freitas. The prosecution concedes that the circuit court's error in this regard warrants vacating Cordeiro's first degree robbery conviction.

Our review of the record confirms that the circuit court's instructions were prejudicially insufficient and erroneous, inasmuch as the prosecution (1) adduced evidence of two separate and distinct culpable acts that arguably supported the requisite "use of force" by Cordeiro (*i.e.*, shooting Blaisdell and threatening Freitas with a firearm) (2) failed to make an election as to the particular act on the basis of which it was seeking conviction, and (3) represented to the jury that only a single offense was committed but that either act could support a guilty verdict as to first degree robbery. *See State v. Arceo*, 84 Hawai'i 1, 32–33, 928 P.2d 843, 874–75 (1996) (holding that "when separate and distinct culpable acts are subsumed within a single count . . .—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless . . . the prosecution is required to elect the specific act upon which it is relying to establish the 'conduct' element of the charged offense[ ] or . . . the trial court gives the jury a specific unanimity instruction[ ]"). *But see State v. Apao*, 95 Hawai'i 440, 24 P.3d 32 (2001) ("[A] specific unanimity instruction is not required if (1) the offense is not defined in such a manner as to preclude it from being proved as a continuous offense and (2) the prosecution alleges, adduces evidence of, and argues that the defendant's actions constitut-

ed a continuous course of conduct."); *State v. Valentine*, 93 Hawai'i 199, 208, 998 P.2d 479, 488 (2000) (holding that a specific unanimity instruction is not required if the defendant's conduct constituted a continuing course of conduct).

 Because the circuit court's insufficient jury instructions prejudiced Cordeiro's substantial constitutional right to a unanimous jury verdict, the error was "plain." *See Arceo*, 84 Hawai'i at 33, 928 P.2d at 875. Correlatively, "inasmuch as we cannot say that there was no reasonable possibility that the circuit court's error contributed to [Cordeiro's] conviction[ ], we hold that the error was not harmless beyond a reasonable doubt[.]" *Id.* We therefore vacate Cordeiro's first degree robbery conviction and remand the matter to the circuit court for a new trial as to Count 4 of the Blaisdell indictment. However, because we hold *infra* in section III.A.2.b that the prosecution may only retry Cordeiro for first degree robbery on the basis that his threat to Freitas constituted the requisite "use of force," there will now be no need for a specific unanimity instruction.

 b. *The circuit court plainly erred in the Blaisdell case by failing to instruct the jury that, under certain circumstances, the charged offense of first degree robbery merges with the charged offense of second degree murder and precludes convictions of both offenses.*

 Relying on *State v. Ah Choy*, 70 Haw. 618, 780 P.2d 1097 (1989), Cordeiro argues that the circuit court plainly erred in failing to instruct the jury that, if it determined that he committed the alleged first degree robbery offense "concurrently" with the alleged second degree murder offense, the two offenses would merge and the jury could, consequently, only convict him of the second degree murder offense. In its answering brief, the prosecution advances no counterargument regarding this point of error.

 ... In *Ah Choy*, we held that where the two offenses, one of which can be a component of the other, were committed concurrently in time, the jury need not render verdicts in both offenses but only in the one carrying the more severe penalty (attempted murder as opposed to robbery). In *Ah Choy*, the defendant approached a cashier to make a small purchase as a ruse, stabbed her in the neck, and immediately reached into the open register and removed money. We held that the attempted murder and the robbery occurred concurrently; we concluded that the legislature never intended that a defendant be convicted of both robbery in the first degree and its component offense of attempted murder in the absence of evidence that the defendant committed both offenses separately in time.

*State v. Denton*, 71 Haw. 46, 50–51, 781 P.2d 662, 664 (1989). *See also* HRS § 701–109(1)(e) ("[a] defendant may not ... be convicted of more than one offense if ... [t]he offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses"); *State v. Hoey*, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994) ("It is possible for kidnapping and robbery charges against a defendant to merge, pursuant to HRS § 701–109(1)(e), under circumstances in which (1) there is but one intention, one general impulse, and one plan, (2) the two offenses are part and parcel of a continuing and uninterrupted course of conduct, and (3) the law does not provide that specific periods of conduct constitute separate offenses."); *cf.* HRS § 701–109(1)(a) ("[w]hen the same conduct of a defendant may establish an element of more than one offense, ... [t]he defendant may not ... be convicted of more than one offense if ... [o]ne offense is included in the other, as defined in subsection (4) of this section"); *State v. Horswill*, 75 Haw. 152, 162, 857 P.2d 579, 584 (1993) ("A defendant may not be convicted of both charged offenses if one is an 'included' offense as defined by HRS § 701–109(4)."). We further held that

 it was plain error for the trial court to fail to instruct the jury of [its] duty to find [the defendant] guilty of only the attempted murder count if [it] determined that [the defendant] committed that offense concur-

rently with the commission of robbery in the first degree. The instruction should have been framed so that once the jury determined that [the defendant] was guilty of attempted murder [it] need not go any further with respect to the robbery count. *Ah Choy,* 70 Haw. at 623, 780 P.2d at 1101.

We have subsequently reiterated that an *Ah Choy* instruction is not required unless the evidence adduced at trial would support a finding that the two offenses, including robbery, which are predicated upon the requisite finding that the defendant used "force," occurred concurrently. *Denton,* 71 Haw. at 51, 781 P.2d at 664; *see also Horswill,* 75 Haw. at 162, 857 P.2d at 584 ("where two different criminal acts are at issue, supported by different factual evidence, even though separated in time by only a few seconds, one offense by definition cannot be included in the other"); *State v. Correa,* 5 Haw.App. 644, 649, 706 P.2d 1321, 1325 (1985) ("a kidnapping that was not necessarily and incidentally committed during a robbery may be charged as a separate offense in addition to the robbery charge[ ]"). In *Denton,* the defendant was convicted of kidnapping and assault offenses that he contended on appeal were "included" within the robbery offenses of which he was also convicted. We distinguished *Ah Choy* on the basis that the record in *Denton* reflected that "the crimes of assault and kidnapping clearly occurred after the robberies and in fact occurred over a period sufficiently extended in time to assure, that the elements of the robberies and of the kidnapping and assaults [did] not overlap." *Denton,* 71 Haw. at 50–51, 781 P.2d at 664.

In light of the foregoing, Cordeiro is partially correct in asserting that he was entitled to an *Ah Choy* instruction with respect to the offenses of first degree robbery and second degree murder. From the evidence adduced at trial, the jury could have found that Blaisdell's gunshot wound constituted the "use of force" requisite to the first degree robbery count; had it so found and been instructed pursuant to our holding in *Ah Choy,* the jury would have convicted Cordeiro of second degree murder and never reached the question whether he committed first degree robbery. On the other hand, the evidence supported a finding—and the prosecution expressly argued—that the requisite "use of force" could

be predicated upon Cordeiro aiming the firearm at *Freitas.* If the latter finding underlay the jury's guilty verdict with respect to first degree robbery, then the elements of the alleged robbery and the alleged murder would not have overlapped, thereby obviating an *Ah Choy* instruction.

■ In any event, the prosecution's failure to elect the act upon which it sought a first degree robbery conviction, in combination with the circuit court's failure to give a specific unanimity instruction, resulted in the lack of an *Ah Choy* instruction affecting Cordeiro's substantial rights and constituting plain error. *See Ah Choy,* 70 Haw. at 623, 780 P.2d at 1101. We cannot say that the plain error was harmless beyond a reasonable doubt, inasmuch as there is a reasonable possibility that the lack of an *Ah Choy* instruction contributed to Cordeiro's conviction of first degree robbery. Accordingly, the circuit court's failure to give an *Ah Choy* instruction constitutes an alternative basis for vacating Cordeiro's first degree robbery conviction and remanding the matter to the circuit court for a new trial as to Count 4 of the Blaisdell indictment.

However, because we are affirming Cordeiro's second degree murder conviction in connection with Blaisdell's death, *see infra,* the prosecution is barred by *Ah Choy* and its progeny from pursuing a first degree robbery conviction on the theory that Cordeiro's murder of Blaisdell constituted the requisite "use of force." The prosecution is now restricted, pursuant to HRS § 708–840(1)(b)(i), to the theory that Cordeiro's alleged act of aiming the firearm at Freitas supports the "use of force" requisite to the commission of first degree robbery. That being so, an *Ah Choy* instruction is no longer necessary or appropriate, because Blaisdell's murder cannot establish the first degree robbery offense.

c. *The circuit court did not plainly err in failing to instruct the jury that "the victim of the theft"—whether the owner of the property taken or the person against whom the defendant allegedly used force—must be "aware of the theft."*

■ Citing *State v. Mitsuda,* 86 Hawai'i 37, 947 P.2d 349 (1997), Cordeiro urges that

the circuit court plainly erred in failing to instruct the jury that the alleged victim's "awareness of the theft is a necessary element of first degree robbery." Cordeiro does not undertake, however, to articulate in what manner he was potentially prejudiced by this alleged "inadequacy." In its answering brief, the prosecution advances no counterargument on the subject.

We noted in *Mitsuda* that, at common law, the offense of first degree robbery required that the victim be aware of the theft, inasmuch as the crime entailed the defendant taking the property of another by "means of force or violence or by putting the victim in fear." 86 Hawai'i at 41–42, 947 P.2d at 353–54 (citations omitted). We observed, however, that, generally speaking, Hawai'i's first degree robbery statute departed from the common law definition of the crime because,

> [u]nder HRS § 708–840, use of force or intimidation "in the course of committing a theft" is the element that distinguishes robbery from theft. "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft, in the commission of theft, or in the flight after the attempt or commission." HRS § 708–842 (1993).... It is clear, therefore, that under HRS § 708–840, force or intimidation need not be used in the actual taking of the property to constitute robbery.

*Mitsuda*, 86 Hawai'i at 42, 947 P.2d at 354 (some citations and emphasis omitted). Thus, pursuant to HRS § 708–840, the offense of first degree robbery could be committed by an act of force that occurred after the actual theft, whereas, at common law, it was necessary that the use of force occur at the time of the actual theft. A majority of this court nonetheless held that "the victim's awareness of the theft is a necessary element of robbery pursuant to HRS § 708–840(1)(b)(ii) [ (1993) ]." 86 Hawai'i at 46, 947 P.2d at 358. We did so because HRS § 708–840(1)(b)(ii) specifically provides in relevant part that a person commits the offense if he or she, in the course of committing theft, is

armed with a dangerous instrument and "threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property." We concluded that the foregoing language "requires that the person threatened be 'present' and that the threat be made with the intent 'to compel acquiescence to the taking of or escaping with the property.' " [12] *Mitsuda*, 86 Hawai'i at 46, 947 P.2d at 358.

However, unlike HRS § 708–840(1)(b)(ii), subsection (b)(i) does not require that the use of force be accompanied by an intent "to compel acquiescence" to the taking of or escaping with the property that the defendant is alleged to have stolen. Rather, HRS § 708–840(1)(b)(i) requires only that force be used against anyone present with the "intent to overcome that person's physical resistance or physical power of resistance[.]" Inasmuch as HRS § 708–840(1)(b)(i) does not require that a defendant use force in order to compel another person to acquiesce in his or her taking of property, we hold that it is not an element (*i.e.*, an attendant circumstance) of the offense that the person against whom the defendant is alleged to have used force be aware of the theft.

Likewise, there is nothing in the plain language of HRS § 708–840(1)(b)(i) that otherwise dictates that the "owner" of the property be aware of the theft. Moreover, the legislative history of HRS § 708–840 reflects that the legislature, in amending the statute in 1983 to proscribe the use of force against "any" person present, intended to render the statute applicable to situations in which the owner of the property was not present at the time of the theft and, thus, could not have been aware of the theft. *See* Sen. Stand. Comm. Rep. No. 788, in 1983 Senate Journal, at 1390.

Accordingly, we hold that the circuit court did not err in failing to instruct the jury that the "victim" of the theft—whether the person against whom force is used or the owner of the property taken—must be aware of the theft.

12. The *Mitsuda* majority "express[ed] no opinion regarding the applicability of [its] analysis to HRS § 708–840(1)(b)(i)," 86 Hawai'i at 40 n. 5, 947 P.2d at 352 n. 5, the subsection of the statute pursuant to which the jury convicted Cordeiro in the present matter.

B. *The Circuit Court Did Not Plainly Err In Consolidating The Charges In The Attempted First Degree Murder Cases With The Charges In The Blaisdell Case.*

■■ Cordeiro asserts that the circuit court plainly erred in consolidating the charges in the attempted first degree murder cases with the charges in the Blaisdell case, on the basis that there was no proximity of time, place, and circumstances, or any commonality among the charges.[13] The prosecution counters that joinder was proper because the consolidated charges comprised a "series of acts connected together or constituting parts of a single scheme or plan." Moreover, the prosecution contends that "it would be impossible to fully discuss the attempted contract killing[s] . . . without explaining the significance of . . . Freitas's testimony in [Cordeiro's] trial for the murder of . . . Blaisdell." For the reasons discussed *infra*, we hold that the circuit court did not err in granting the prosecution's motions for consolidation.

HRPP Rule 13(a) provides in relevant part that "[t]he court may order consolidation of two or more charges for trial if the offenses . . . could have been joined in a single charge." "Two or more offenses may be joined in one charge, with each offense stated in a separate count, when the offenses[ ] . . . are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." HRPP Rule 8(a).

In the present matter, the attempted first degree murder cases and the Blaisdell case were properly joined as "a series of acts connected together and constituting parts of a single scheme or plan" because all of the charges were related to the Blaisdell murder, regardless of whether they involved Cordeiro's conduct on August 11, 1994 or his subsequent attempts to eradicate evidence of the crime and evade conviction by eliminating the prosecution's principal witness in the murder trial. *See State v. Balanza*, 93 Hawai'i 279, 289, 1 P.3d 281, 291 (2000) (approving joinder of related incidents); *Fotopoulos*

*v. State*, 608 So.2d 784, 789–90 (Fla.1992) (approving joinder of two distinct offenses linked in a causal sense because one induced the other); *State v. Chaney*, 160 N.J.Super. 49, 388 A.2d 1283, 1291 (1978) (holding that threat directed at material witness to murder was properly joined with murder charge). *See also State v. Pierce*, 770 A.2d 630, 634 (Me.2001) ("If the offenses charged are connected in any reasonable manner, they are properly joinable."). Indeed, we agree with the prosecution that it would have been impossible to demonstrate Cordeiro's motive with respect to the attempted first degree murder cases without introducing evidence concerning the Blaisdell case.

■■■ If multiple charges are properly joined pursuant to HRPP Rules 8(a) and 13(a), they, nonetheless, may be severed pursuant to HRPP Rule 14 (1998) "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses[.]" Joinder may prejudice a defendant by (1) preventing him or her from presenting conflicting defenses or evidence with respect to each charge, (2) permitting the prosecution to introduce evidence that would be inadmissible with respect to certain charges if tried separately, or (3) bolstering weak cases through the cumulative effect of the evidence. *See State v. Gaspar*, 8 Haw.App. 317, 328–29, 801 P.2d 30, 36 (1990); *United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir.1987). In deciding whether to sever consolidated charges pursuant to HRPP Rule 14, "the trial court must weigh the possible prejudice to the defendant against the public interest in judicial economy." *Balanza*, 93 Hawai'i at 289, 1 P.3d at 291 (citing *State v. Timas*, 82 Hawai'i 499, 512, 923 P.2d 916, 929 (App.1996)). "The decision to sever is in the sound discretion of the trial court; a defendant is not entitled to a severance as a matter of right." *Id.* at 288, 1 P.3d at 290 (citing *State v. Matias*, 57 Haw. 96, 98, 550 P.2d 900, 902 (1976)).

■■■ Cordeiro asserts that he was prejudiced by the consolidation because it permitted the prosecution to introduce evidence

---

**13.** Cordeiro neither opposed consolidation nor brought a motion to sever the consolidated cases.

Thus, he invokes the doctrine of plain error in urging us once again to vacate his convictions.

that would have been inadmissible in some of the cases if they had been tried separately. Specifically, he contends: (1) that evidence regarding Cordeiro's attempts to hire someone to murder Freitas would have been inadmissible in the Blaisdell case; (2) that the same level of detail regarding Blaisdell's murder was not required for the attempted first degree murder cases as for the Blaisdell case; (3) that the evidence of Cordeiro's use and sales of drugs would have been inadmissible in the attempted first degree murder cases;[14] and (4) that the testimony of Cornelio, Detective Camara, and Kekona, regarding Kekona's attack on Cornelio would only have been admissible in the Cornelio case. In addition, Cordeiro asserts that consolidation allowed the prosecution to bolster four weak cases by means of the cumulative evidence.

The prosecution maintains that the fact that the jury acquitted Cordeiro of two of the attempted first degree murder charges (the Cornelio and Kapika cases) demonstrates that he was not, in fact, prejudiced by the consolidated trial. Indeed, the prosecution suggests that consolidation of the charges worked to Cordeiro's advantage, because he was able to argue to the jury that the prosecution was "desperate, trying to convict him on the flimsiest of evidence[.]"

First, we disagree with Cordeiro that evidence of the attempted first degree murders would have been inadmissible in the Blaisdell case if the consolidated cases had been tried separately. Evidence of a defendant's attempts to murder a material witness to the offense with which he or she is charged is admissible to prove the defendant's consciousness of guilt.[15] *See State v. Arlt*, 9 Haw.App. 263, 268, 833 P.2d 902, 905 (1992) (holding that evidence of defendant's attempts to destroy evidence that might link him to crime was admissible as evidence of consciousness of guilt); *Neal v. State*, 659 N.E.2d 122, 124 (Ind.1995) ("We have long held that threats against potential witnesses

are attempts to conceal or suppress implicating evidence, and are admissible as bearing upon a defendant's guilty knowledge[.]") (abrogated on other grounds); *State v. Davis*, 149 La. 1009, 90 So. 385, 387 (1922) ("Evidence of an attempt to intimidate a witness is, of course, admissible."); *People v. Ranes*, 63 Mich.App. 498, 234 N.W.2d 673, 675 (1975) ("actions by the defendant such as ... attempts to destroy evidence ... may be considered by the jury as evidence of guilt" (internal quotation signals and citation omitted)); *Mattox v. State*, 243 Miss. 402, 137 So.2d 920, 923 (1962) (noting that evidence of defendant's attempt to procure death of material witness against him "was of probative value as an incriminating circumstance inconsistent with appellant's innocence; and as tending to show a consciousness of guilt and that his cause lacked honesty and truth"); *Mitchell v. State*, 982 P.2d 717, 723 (Wyo. 1999) ("A defendant's activity after committing a crime in an attempt to evade detection is 'relevant circumstantial evidence of guilt.'" (Citation omitted.)). Thus, Cordeiro's attempts to procure Freitas's death would have been admissible in the Blaisdell case as evidence of Cordeiro's consciousness of guilt even if the consolidated cases had been tried separately.

Second, assuming *arguendo* that some of the prosecution's evidence would have been inadmissible in some of the cases if tried separately, we nonetheless hold that Cordeiro was not prejudiced by the admission of such evidence in the present matter. Consolidated trials will almost always permit the admission of some evidence that would not be admissible with respect to each and every one of the charges if tried separately. While the admission of such evidence may result in some potential for prejudice, we have held that such prejudice may be effectively dispelled by a jury instruction to the effect that "[e]ach count and the evidence that applies to that count is to be considered separately." *Balanza*, 93 Hawai'i at 289, 1 P.3d at 291.

14. The evidence adduced concerning Cordeiro's use and sale of illegal drugs is discussed more fully *infra* in section III.C.

15. We also note that evidence of Cordeiro's murder of Blaisdell would arguably have been admissible in the attempted first degree murder cases, if tried separately, to show motive. *See* Hawai'i Rules of Evidence (HRE) Rule 404(b) (evidence of prior bad acts is admissible to show motive).

*Accord Johnson,* 820 F.2d at 1071 ("When evidence concerning the other crime is limited or not admissible, our primary concern is whether the jury can reasonably be expected to 'compartmentalize the evidence' so that evidence of one crime does not taint the jury's consideration of another crime.... We must insure that the trial court properly instructed the jury on the limited admissibility of evidence ... and will determine whether the jury appeared to have followed the instructions." (Citations omitted.)); *cf. Dorador v. State,* 768 P.2d 1049, 1052 (Wyo. 1989) (noting that defendant may be prejudiced if "the evidence relating to the separate offenses would be so complicated that the jury could not reasonably be expected to separate them and evaluate the evidence properly and individually on each separate charge[ ]").

In the present matter, the circuit court instructed the jury in relevant part that:

> The Defendant is charged with more than one offense under separate counts in the indictments. Each count and the evidence that applies to that count is to be considered separately. The fact that you may find the defendant not guilty or guilty of one of the counts charged does not mean that you must reach the same verdict with respect to any other count charged.

The circuit court additionally instructed the jury that it could not use evidence of "other crimes, wrongs, or acts ... to determine that the Defendant is a person of bad character and, therefore, must have committed the offense charged in this case." "[The] jury is presumed to have followed the [circuit] court's instructions." *Balanza,* 93 Hawai'i at 289, 1 P.3d at 291 (citing *State v. Jhun,* 83 Hawai'i 472, 482, 927 P.2d 1355, 1365 (1996)); *accord State v. Webster,* 94 Hawai'i 241, 11 P.3d 466 (2000). Moreover, there is no reason to doubt that the jury was able to assess the credibility of the witnesses and weigh the

evidence in each case without reference to the others. Thus, assuming *arguendo* that certain evidence, including the evidence of Cordeiro's use and sale of illegal drugs, would have been inadmissible in some of the cases if tried separately,[16] the circuit court dispelled any potential for prejudice by means of its jury instructions.

Third, the jury's acquittal of Cordeiro in two of the attempted first degree murder cases (the Cornelio and Kapika cases), suggests that the jury, in fact, followed the circuit court's instructions and did not infer a criminal disposition from the cumulative charges. *See State v. Every,* 678 So.2d 952, 958 (La.Ct.App.1996) (noting that jury's acquittal of defendant of one charged offense negated defendant's argument that jury had inferred criminal disposition from multiple charges). Consequently, we do not believe that the prosecution was able to bolster the Blaisdell or Iona cases by means of consolidation or that Cordeiro was, in fact, prejudiced by consolidation.

In sum, we hold that circuit court did not plainly err in determining that the public interest in judicial economy outweighed any potential prejudice to Cordeiro and, accordingly, in granting the prosecution's motions for consolidation of the attempted first degree murder charges with the charges in the Blaisdell case.

C. *The Circuit Court Did Not Err In Admitting Evidence Of "Other Crimes, Wrongs, And Bad Acts."*

■ Cordeiro maintains that the circuit court erred in admitting evidence of (1) other crimes, wrongs, and bad acts involving his use and sale of illegal drugs and (2) a threat that he directed against Daneen Mitsumura (a former friend of Cordeiro's and a witness for the prosecution), on the bases (a) that it constituted improper character evidence pur-

---

16. We note, in this regard, that it would have been exceedingly difficult to introduce evidence establishing motive in the attempted first degree murder cases without introducing evidence pertaining to Cordeiro's use and sale of illegal drugs. *See supra* note 15. Cordeiro had a motive to kill Freitas because Freitas witnessed Blaisdell's murder and because he knew that Blaisdell was attempting to purchase a pound of

marijuana. Freitas's knowledge that Blaisdell was attempting to purchase marijuana was significant because Cordeiro was, based on his use and sale of illegal drugs, a likely source of marijuana. Thus, as discussed *infra* in section III.C, Cordeiro's use and sale of illegal drugs was inextricably linked to the charges in both the Blaisdell case and the attempted first degree murder cases.

suant to HRE Rule 404(b) and, alternatively, (b) that its probative value was substantially outweighed by the danger of unfair prejudice pursuant to HRE Rule 403. Furthermore, even if some of the evidence of his use and sale of illegal drugs was admissible, he contends that the evidence of his involvement with drugs amounted to prosecutorial "cumulative overkill." Finally, Cordeiro contends that the circuit court's limiting instruction with respect to the evidence of "other bad acts" was inadequate and untimely.

The prosecution argues that the evidence of Cordeiro's use and sale of illegal drugs was admissible to show motive, intent, opportunity, identity, plan, preparation, and knowledge. Specifically, the prosecution contends that the fact that Cordeiro was "a heavy drug user and deals drugs makes it more likely than not that he would be able to obtain marijuana for Blaisdell." Thus, the prosecution asserts, the evidence of Cordeiro's involvement with drugs explains why Blaisdell "had a rational basis for contacting [Cordeiro] for the purchase of a pound of marijuana[,]" giving Cordeiro the motive and opportunity to murder Blaisdell. The prosecution maintains that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We agree.

■ HRE Rule 404(b) provides that
[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.
"The list of permissible purposes in Rule 404(b) is not intended to be exhaustive 'for

the range of relevancy outside the ban is almost infinite.'" *State v. Clark*, 83 Hawai'i 289, 926 P.2d 194 (1996) (quoting E.W. Cleary, *McCormack on Evidence* § 190, at 448 (Cleary ed.1972)).

■ However, HRE Rule 403 provides that,
[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
In determining whether the probative value of evidence of other bad acts is substantially outweighed by the danger of unfair prejudice,
the trial court must weigh a variety of factors.... These include "the strength of the evidence as to the commission of the other [bad acts], the similarities between the [bad acts], the ... time that has elapsed between [the bad acts], the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility."
*State v. Robinson*, 79 Hawai'i 468, 471, 903 P.2d 1289, 1292 (1995) (quoting *State v. Pinero*, 70 Haw. 509, 518, 778 P.2d 704, 711 (1989) (citing E.W. Cleary, *McCormack on Evidence* § 190, at 565 (3d ed.1984))).

As noted *supra* in section II.C, this court reviews the circuit court's admission of evidence, pursuant to HRE Rule 404(b), in accordance with the "right/wrong" standard; by contrast, we review the circuit court's weighing of probative value against the danger of unfair prejudice, pursuant to HRE Rule 403, for abuse of discretion.

In the present matter, at a pretrial conference on December 17, 1997, the prosecution notified the circuit court and defense counsel that it intended to offer HRE Rule 404(b) evidence. On April 27, 1998, the prosecution filed a memorandum in support of its proposed use of HRE Rule 404(b) evidence, and, on June 24, 1998, Cordeiro filed a motion in limine seeking to exclude, *inter alia*, the "other bad acts" evidence of which he now

complains. After conducting a hearing on the motion, during which the circuit court reviewed the specific evidence that the prosecution sought to introduce at trial, the circuit court ruled that the evidence was admissible in part. The circuit court explained its ruling as follows:

[C]ontrary to the Defense position, this Court is finding that there is relevance to the evidence that is being sought to be submitted; that the evidence that is being sought · is—appears, from the offers of proof anyway, to be significant as regards the involvement of the Defendant in drugs, and therefore, the opportunity for the victim and the Defendant to make arrangements for the purchase of drugs at the time of this particular incident.

Without this evidence, the State would not be able, otherwise, to tie in the presence of the Defendant—or the motive of the Defendant to be present at the scene [of] this incident. Although they have an eyewitness, the eyewitness cannot himself demonstrate motive, opportunity, knowledge, or intent or plan or preparation on the part of the Defendant to get involved in this particular crime. Any kind of alternative proof is simply not available to demonstrate this argument or fact on the part of the State.

Now, the question of unfair prejudice. The Court doesn't deny that there is prejudice if these witnesses testify as to the defendant's use of drugs and/or sale of drugs. However, I don't find that there is going to be any kind of overmastering hostility on the part of the jury about this testimony, which will be limited, as the Court has already ordered, and which will not be allowed to be introduced to prove that the Defendant acted in conformity with any kind of character that he has or propensity he has to get involved in drugs.

.... Weighing the probative value versus the unfair prejudice, the Court finds that the probative value far outweighs— and the need for this evidence outweighs the prejudice—the prejudicial impact of this testimony on the Defendant.

1. *The probative value of Cordeiro's use and sale of illegal drugs prior to Blaisdell's murder was not substantially outweighed by the danger of un-· fair prejudice.*

Cordeiro specifically objects to the admission of the following evidence regarding his use and sale of drugs prior to Blaisdell's murder: (1) Mitsumura's ·testimony regarding Cordeiro's use and sales of crystal methamphetamine and cocaine in 1994,[17] (2) Edward Joy's testimony that, a couple of weeks before Blaisdell's murder, Blaisdell expressed concern about Cordeiro's use of crystal methamphetamine,[18] (3) Iona's testimony that he and Cordeiro were involved in three or four sales of crystal methamphetamine together during the summer of 1994, (4) Curtis Diment's testimony that he had used marijuana, crystal methamphetamine, and nitrous oxide with Cordeiro in August 1994, and (5) Detective William Fernandez's testimony that, when he questioned Cordeiro on August 15, 1994, Cordeiro stated that he had not seen Blaisdell for about a month because "he was trying to get himself away from drugs and clean himself up."

We agree with the circuit court that the aforementioned evidence was admissible pursuant to HRE Rule 404(b). Specifically, the fact that Cordeiro used and sold illegal drugs made it more probable that he was the person whom Blaisdell arranged to meet on "skid row" in order to purchase a pound of marijuana and, consequently, that Cordeiro had the motive to meet, murder, and rob Blaisdell and that he had planned and prepared to do so. *Cf. State v. Austin,* 70 Haw. 300, 307, 769 P.2d 1098, 1102 (1989) (holding that the similarity between a defendant's earlier drug dealing and the drug dealing offense with which he was charged was extremely relevant to prove both a plan and a common scheme); *State v. Kealoha,* 95 Ha-

---

**17.** In addition to the fact that Cordeiro used drugs, Mitsumura testified that "[Cordeiro] was mellow, I guess, when he used to smoke batu, and kind of irritated, I guess, when he would do cocaine."

**18.** The circuit court admitted Blaisdell's comment as a statement of recent perception pursuant to HRE Rule 804(b)(5) (1998).

wai'i 365, 380, 22 P.3d 1012, 1027 (App.2000) (holding that "[e]vidence that [d]efendant sold methamphetamine to finance her cocaine use is probative of whether [d]efendant had a motive to manufacture methamphetamine and her intent to do so").

The fact that most of the evidence that Cordeiro challenges involved his use and sale of crystal methamphetamine and cocaine, rather than marijuana, does not change our view of its relevance. Although illegal drugs may differ in various respects, and some dealers may specialize in certain illegal drugs, it would not have been irrational for Blaisdell to contact a person known to sell one type of drug in the course of his search for another. *See Kealoha,* 95 Hawai'i at 380, 22 P.3d at 1027 ("Defendant's cocaine use ... demonstrated her knowledge of the nature of illegal drugs."); *United States v. Lampley,* 68 F.3d 1296, 1299–1300 (11th Cir. 1995) (holding that evidence of defendant's prior sales of marijuana was admissible to show motive, intent, knowledge and willfulness of defendant charged with selling cocaine); *Colon v. State,* 113 Nev. 484, 938 P.2d 714, 719 (1997) (holding that defendant's knowledge of marijuana was relevant to show her knowledge of drugs, including methamphetamine). Quite simply, the fact that Blaisdell, among others, was aware that Cordeiro was known to use and sell crystal methamphetamine and cocaine makes it more probable that Blaisdell contacted him in the course of his search for a pound of marijuana.

Furthermore, we do not believe that the circuit court abused its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. First, although there was ample evidence available to establish that Blaisdell was murdered in the course of purchasing a pound of marijuana, there was no other evidence available to show why Cordeiro was the person whom Blaisdell met on "skid row." Neither Freitas nor any other witness was aware that Blaisdell had arranged to purchase a pound of marijuana from Cordeiro. Consequently, without evidence of Cordeiro's use and sale of illegal drugs, the prosecution would have been unable to establish Cordeiro's motive for meeting Blaisdell on "skid row." [19] Thus, the probative value of the evidence was very high.

Second, the evidence's potential for prejudice was not as great as Cordeiro suggests. There were no drug charges in Cordeiro's case. Consequently, there was no possibility that the jury would infer that, because of Cordeiro's propensity to use drugs, he was guilty of a drug-related offense. Moreover, Cordeiro was not the only person involved in the present matter who had a history of drug use or drug dealing. The evidence adduced at trial established that Freitas, Blaisdell, and two of the three principal witnesses in the attempted first degree murder cases, among others, had used or sold illegal drugs. Therefore, the danger of the jury singling out Cordeiro for overmastering hostility based on his use of drugs was remote.[20] Finally, the potential for unfair prejudice was effectively dispelled by the circuit court's limiting instruction to the jury, as discussed *infra* in section III.C.3.

2. *The probative value of Cordeiro's "other bad acts" occurring after Blaisdell's murder was not substantially outweighed by the danger of unfair prejudice.*

Cordeiro also objects to the admission of certain evidence pertaining to "other

19. Blaisdell's concerns about Cordeiro's drug use were particularly probative in this regard, because they tended to establish that Blaisdell was aware that Cordeiro was a heavy drug user and, thus, might be a good source of marijuana.

20. We note that Cornelio was the only principal witness in the attempted first degree murder cases who did not admit to using or selling illegal drugs; yet the jury did not find him to be credible, as demonstrated by the fact that the jury acquitted Cordeiro in the Cornelio case. Iona, by contrast, admitted that he had sold crystal methamphetamine more than once and that he had been so drugged up at one point in his life that his "mind wasn't stabilized"; yet the jury believed his testimony, as demonstrated by the fact that it found Cordeiro guilty as charged in the Iona case. Furthermore, although Kapika claimed that Cordeiro offered to repay him for the murder of Freitas with drugs, potentially highly prejudicial evidence to say the least, the jury acquitted Cordeiro of the charges in the Kapika case, suggesting that he was not, in fact, prejudiced by the "bad acts" testimony.

bad acts" that occurred after Blaisdell's murder. First, Cordeiro argues that the circuit court erred in admitting the testimony of Emil Muraoka that, in October 1994, Cordeiro identified Shirota to him and claimed that he and Shirota either were in the midst of, or had previously been involved in, a sale of crystal methamphetamine together. Cordeiro contends that Muraoka's testimony was "outside the relevant time frame" because Muraoka did not know when the transaction took place and that the occurrence may have been after Blaisdell's death. Second, Cordeiro contends that the circuit court erred in admitting Mitsumura's testimony: (1) that on the day after Blaisdell's murder, (a) she had smoked crystal methamphetamine with Cordeiro, (b) Cordeiro had stated, "There's too many cops in Kula[,]" and (c) Cordeiro had instructed her to destroy a pipe that they had been using in order to prevent access to any latent fingerprints, and (2) that she had argued with Cordeiro a month after Blaisdell's murder, during which Cordeiro had threatened to "shoot" Mitsumura if she did not return a pipe to him. Cordeiro contends that Mitsumura's testimony was both irrelevant and prejudicial, because it led the jury to believe that he was a violent, drug-crazed person.

The evidence of Cordeiro's sale of illegal drugs around the time of Blaisdell's murder, whether before or after, was relevant to show that Cordeiro was involved in the sale of drugs at that time and, thus, as discussed *supra* in section III.C.1, was relevant to establish identity, motive, preparation, and plan. Moreover, Cordeiro's collaboration with Shirota was relevant to establishing the nature of their relationship, from which the jury could infer that it was probable that Cordeiro had borrowed Shirota's truck in order to meet Blaisdell on "skid row" on August 11, 1994.

Mitsumura's testimony regarding Cordeiro's concerns about the police and his fingerprints on the day after Blaisdell's murder was highly probative of his consciousness of guilt. *See Arlt,* 9 Haw.App. at 268, 833 P.2d at 905. Moreover, the jury could infer

from Cordeiro's threat to "shoot" Mitsumura that he possessed the means to carry out his threat—*i.e.,* that Cordeiro possessed a firearm. Thus, though hardly conclusive in itself, the testimony tended to corroborate Freitas's testimony that Cordeiro possessed a gun at the time of Blaisdell's death. *Cf. United States v. Covelli,* 738 F.2d 847, 855 (7th Cir. 1984) ("evidence of a prior possession of a weapon can be used to prove opportunity and identification even where it cannot be directly identified as the weapon used in the crime"). This was highly probative because the murder weapon was never recovered.

Admittedly, evidence of Cordeiro's threat against Mitsumura was potentially prejudicial because the jury may have believed that, because Cordeiro threatened to shoot Mitsumura, he must have shot Blaisdell. However, although the question may be close, we cannot say that the circuit court abused its discretion in determining that the probative value of Mitsumura's testimony was not substantially outweighed by its potential for unfair prejudice and therefore allowing the testimony to be received in evidence.

3. *The circuit court's limiting instruction adequately dispelled the potential for prejudice resulting from the evidence of Cordeiro's "other bad acts."*

Finally, Cordeiro contends that, even if the probative value of the individual references to his involvement with illegal drugs was not substantially outweighed by the danger of unfair prejudice, the "constant and numerous references" amounted to "cumulative overkill." In addition, he maintains that it was plain error for the circuit court (1) to wait until the conclusion of the trial before giving a limiting instruction regarding the "other bad acts" evidence and (2) to fail to identify the "drug" evidence covered by the limiting instruction.[21] We disagree.

Cordeiro cites *Austin,* 70 Haw. at 309, 769 P.2d at 1103, in support of his contention that the evidence of his use and sale of illegal drugs rose to the level of "cumulative overkill." Austin was convicted

---

21. Cordeiro expressly agreed that the limiting instruction should be given at the end of the trial, and did not object to its content. Hence his invocation of the doctrine of plain error.

of the sale of cocaine. *Austin*, 70 Haw. at 300, 769 P.2d at 1098. The evidence, however, that we described as "unnecessary overkill" in *Austin*—*i.e.*, an illegal drug operation with which Austin's associates, but not Austin himself, were involved—was not relevant to any fact of consequence in the case; unlike the present matter, the evidence was not relevant to show the defendant's identity, motive, preparation, or plan. *Id.* at 309, 769 P.2d at 1103. Rather, it was merely "somewhat relevant to outline how the police received information about [Austin's] incriminating statement[.]"[22] *Id.* Indeed, the evidence was not even technically "other bad acts" evidence, because Austin was not directly linked to the illegal operation. We therefore, held that the danger of unfair prejudice—*i.e.*, guilt by association—substantially outweighed any relevance the evidence might have. *Id.* By contrast, we also held that the circuit court did not abuse its discretion in allowing proof of Austin's own prior sales of illegal drugs as evidence of a common scheme. *Id.* at 308, 769 P.2d at 1102.

Unlike the *improperly* admitted evidence of the defendant's associates' bad acts in *Austin*, the evidence of Cordeiro's use and sale of illegal drugs was directly relevant and probative. Thus, it was analogous to the *properly* admitted "other bad acts" evidence in *Austin*. Moreover, as we have discussed above, there were no drug charges in Cordeiro's consolidated trial, thereby significantly diminishing the danger of unfair prejudice. Given the length of Cordeiro's trial and the evidence of use and sale of illegal drugs on the part of numerous involved individuals, we do not believe that the evidence relating to Cordeiro constituted "cumulative overkill."

At the conclusion of the trial, the circuit court instructed the jury:

> You have heard evidence that the Defendant at another time may have committed other crimes, wrongs, or acts. You must not use this evidence to determine that the Defendant is a person of bad character and, therefore, must have committed the offenses charged in this case. Such evidence may be considered by you only on the issue of the Defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or state of mind and for no other purpose.

The circuit court's limiting instruction accurately enumerated the permissible uses of HRE Rule 404(b) evidence and correctly admonished the jury not to utilize "other bad acts" evidence for any improper purpose. "[The] jury is presumed to have followed the [circuit] court's instructions." *Balanza*, 93 Hawai'i at 289, 1 P.3d at 291 (citing *Jhun*, 83 Hawai'i at 482, 927 P.2d at 1365). Cordeiro cites no authority in support of his position that the trial judge must specifically identify the "other bad acts" evidence covered by the limiting instruction,[23] nor are we aware of any. Indeed, we do not believe that a trial judge should necessarily specify the HRE Rule 404(b) evidence covered by a limiting instruction given at the conclusion of the trial. Such specificity would risk prejudicial omission or unnecessary highlighting of the evidence in the minds of the jurors immediately prior to their deliberations, especially in a case, such as the present matter, in which a significant quantity of "other bad acts" evidence is introduced over the course of several weeks.

Furthermore, the circuit court's decision to issue a single limiting instruction at the conclusion of the trial, rather than each time the prosecution introduced HRE Rule 404(b) evidence, did not, in our view, jeopardize Cordeiro's right to a fair trial. The trial judge must consider on a case-by-

22. Justice Nakamura, concurring in the majority opinion, wrote that, "[if], as the trial judge found, there was no shred of evidence connecting the defendant and [the illegal drug operation], testimony about it was irrelevant[.]"

23. Cordeiro does cite *United States v. Vasquez-Velasco*, 15 F.3d 833, 846 (9th Cir.1994), for the proposition that a "trial judge has a duty to diligently instruct the jury on the purpose of the various types of evidence." But *Vasquez-Velasco*, which addressed the joinder of charges against multiple defendants in a single trial, simply notes that, "[i]n assessing whether joinder was prejudicial, of foremost importance is whether the evidence as it relates to the individual defendants is easily compartmentalized." *Vasquez-Velasco*, 15 F.3d at 846. Consequently, the decision is unhelpful to Cordeiro.

case basis whether to issue a limiting instruction when HRE Rule 404(b) evidence is introduced and/or at the conclusion of the trial. There is no bright-line rule. *Compare Barretto v. Akau*, 51 Haw. 383, 397–98, 463 P.2d 917, 926 (1969), *with State v. Chong*, 3 Haw. App. 246, 253–54, 648 P.2d 1112, 1117–18 (1982). Inasmuch as Cordeiro was not on trial for any drug-related offenses, but evidence of the use and sale of illegal drugs nevertheless permeated the trial, numerous and repetitive limiting instructions might well have needlessly highlighted and focused attention upon the evidence.

Ultimately, Cordeiro's contention that the jury was roused to overmastering hostility by the evidence of his involvement with drugs is belied by the fact that the jury acquitted him of two of the attempted first degree murder charges.[24] Thus, the record is devoid of any indication that the jury, in fact, made inappropriate use of the "other bad acts" evidence or that his right to a fair trial was jeopardized.

In sum, we hold (1) that the circuit court correctly determined that the evidence of Cordeiro's use and sale of illegal drugs and his threat to "shoot" Mitsumura were relevant and (2) that the circuit court did not abuse its discretion in determining that the probative value of these "other bad acts" was not substantially outweighed by the danger of unfair prejudice.

D. *The Circuit Court Did Not Err In Admitting the Testimony Of Dr. Manoukian Regarding The Trajectory Of The Bullet That Killed Blaisdell.*

■ Cordeiro argues that the circuit court erred in permitting Dr. Manoukian to testify as a "homicide reconstruction expert," on the basis that the physician's qualifications as an expert in the area of "anatomic, clinical and forensic pathology" did not quali-

fy him to construct "a physical model showing the path and trajectory of the bullet" that killed Blaisdell. Contrary to Cordeiro's contention, however, Dr. Manoukian did not construct any models. Rather, he used a styrofoam head to illustrate the results of the autopsy that he performed on Blaisdell and, more specifically, to indicate the point of entry and path of the bullet that killed Blaisdell. As an expert in the area of anatomic, clinical, and forensic pathology, Dr. Manoukian was qualified to perform an autopsy on Blaisdell and to illustrate the results of the autopsy using a styrofoam head. Consequently, the circuit court did not err in permitting Dr. Manoukian's testimony.

E. *The Circuit Court Did Not Err In Striking Cordeiro's Expert Witness.*

■ Cordeiro contends that the circuit court erred in striking his expert witness, Wayne Hill, whom he claims would have testified that the residue lifted from Shirota's truck was not only consistent with gunshot residue, but also with such other environmental sources as a lead radiator or an automobile battery. The prosecution points out (1) that Cordeiro expressly agreed to the circuit court's striking Hill because Cordeiro's defense counsel was unable to contact him, (2) that defense counsel never clearly requested that the circuit court change its prior ruling, and, (3) in any event, that Hill was never qualified as an expert.

Our review of the record confirms that Cordeiro did indeed agree to strike Hill from his witness list during a hearing on pretrial motions, conducted on June 30, 1998, because Cordeiro's defense counsel "was not able to get anything from Mr. Hill" and had no idea what his testimony would be. We also agree with the prosecution that Cordeiro never moved the circuit court to reconsider the matter.[25] Accordingly, we hold that the cir-

24. *See also supra* note 20.

25. The only subsequent reference to Hill that we can find appears in the July 30, 1998 trial transcript, which reflects the following colloquy in Judge Mossman's chambers:
 [Defense counsel:] ... [A]t this point [Hill] is not available to me based on the prior—the Court's prior order that he be stricken. He

does live on the mainland. I haven't had contact with [Hill] for some period of time now.
 However, if he were available to me at this point I would be calling him as a witness and he would be testifying in rebuttal with respect to ... the witness who testified with respect to the gunshot residue.
 ....

cuit court did not err in striking Hill from the witness list.

### F. The Circuit Court's Restrictions On Defense Counsel's Cross–Examination Did Not Prejudice Cordeiro.

 Cordeiro argues that certain restrictions that the circuit court imposed on the scope of defense counsel's cross-examination violated his right to confrontation, as guaranteed by article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution, requiring us to vacate his convictions.[26] We disagree.

Article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution guarantee criminal defendants the right to be confronted with witnesses against them. "[I]mplicit in [a] defendant's right to confront witnesses against him, is his right to cross-examine and to impeach the confronted witness." State v. Napeahi, 57 Haw. 365, 372–373, 556 P.2d 569, 574 (1976). However, "[t]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the trial process." State v. El'Ayache, 62 Haw. 646, 649, 618 P.2d 1142, 1144 (1980). Furthermore,

> [t]he law is well-settled that the admissibility of evidence, generally, and the scope of cross-examination at trial are matters exercised within the discretion of the trial court.... The trial court's exercise of its discretion to limit the scope of cross-examination will not be ruled as reversible error when it limits irrelevant and repetitious questions by counsel [and the limitation does]

[Prosecution:] The Court has already ruled on Mr. Hill....
 So it seems totally inappropriate to ask the Court to go back on its earlier ruling.
 [Circuit Court:] I don't think he's asking me to go back.
 [Defense counsel:] Just clarifying for the record.
The foregoing comments certainly do not constitute a motion for reconsideration of the circuit court's prior ruling.

not result in any manifest prejudice to the defendant.

State v. Young, 8 Haw.App. 145, 151, 795 P.2d 285, 290 (quoting State v. Faulkner, 1 Haw.App. 651, 654–55, 624 P.2d 940, 943–44 (1981)), cert. denied, 71 Haw. 669, 833 P.2d 901 (1990)....

> The burden of establishing abuse of discretion is on appellant and a strong showing is required to establish it. To constitute abuse, it must appear that the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

Faulkner, 1 Haw.App. at 654, 624 P.2d at 943.

State v. Okumura, 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995).

 Moreover, "the harmless error standard ... applies to infringements on the right to cross-examine witnesses." Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan, 87 Hawai'i 217, 245, 953 P.2d 1315, 1343 (1998). Thus, if the trial court does in fact err in limiting cross-examination,

> [t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

26. Article I, section 14 of the Hawai'i Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused[.]" The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]"

*Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citations omitted). *See also* Commentary to HRE Rule 103 (1993) ("error in admission of testimony is not a basis for reversal absent 'substantial resulting prejudice' to the rights of a party").

Cordeiro cites three instances—each involving sustained prosecutorial objections to questions posed by defense counsel—of alleged violations of his right to confrontation. We address each instance in turn.

### 1. *Amanda Valentine*

First, Cordeiro maintains that the circuit court erred in sustaining the prosecution's objection to defense counsel's cross-examination of Amanda Valentine regarding a statement that she made to the police on August 15, 1994. Only moments before, defense counsel had asked Valentine whether she remembered stating to the police, on August 12, 1994, that she had observed Freitas and Blaisdell together in Freitas's truck at around 5:15 p.m. on August 11, 1994, and Valentine had answered that she did not;[27] the prosecution objected to the question on the ground that it had already been asked and answered, and the circuit court sustained the objection.

Our review of the transcript reveals that, although defense counsel had asked Valentine whether she remembered "telling [the police] on at least two different occasions," including August 12, 1994, that she had observed Blaisdell and Freitas together at around 5:15 p.m., defense counsel had not specifically asked Valentine whether she remembered stating to the police on August 15, 1994 that she had seen the two together at around 5:15 p.m. Accordingly, we agree with Cordeiro that the circuit court erred in sustaining the prosecution's objection.

Nevertheless, we believe that the circuit court's error was harmless beyond a reasonable doubt. As noted above, defense counsel *was* permitted to impeach Valentine on the basis of both her August 12, 1994 statement to the police and the allusion to a similar statement made to the police on another occasion. Thus, given the totality of defense counsel's cross-examination, we believe that Cordeiro's substantial rights were not affected. Moreover, Valentine's testimony was not crucial to the prosecution's case. Freitas's testimony that, on August 11, 1994, he picked Blaisdell up sometime after 5:15 p.m. and arrived at skid row sometime after 5:45 p.m., was corroborated by Arthur Delima, Jr., who testified that he observed Freitas and Blaisdell driving together on the Kula Highway at approximately 5:30 p.m. (which, according to Freitas, was shortly after Valentine observed him with Blaisdell). In any event, the jury's determination that Cordeiro murdered Blaisdell could not have turned on Valentine's testimony, because the precise timing of events on August 11, 1994 was not particularly significant. This was not a case in which the defendant had a hole in his alibi; the jury simply did not find Cordeiro's numerous alibi witnesses, who testified that he never left his house on the evening of August 11, 1994, to be credible. Thus, "assuming that the damaging potential of the cross-examination were fully realized," we hold that there is no reasonable possibility that it would have changed the outcome of Cordeiro's trial.

### 2. *Cornelio's second forgery conviction*

Second, Cordeiro asserts that the circuit court erred in sustaining the prosecution's objection to a question posed to Cornelio by defense counsel during recross-examination. Cordeiro's defense counsel asked Cornelio if he had been convicted of two counts of forgery, rather than one, as he had previously testified in the course of *direct* examination, the prosecution objected to the question as "beyond the scope" of redirect, and the circuit court sustained the objection.

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." HRE Rule 611(b) (1993); *see also State v. Napulou,* 85 Hawai'i 49, 57, 936 P.2d 1297, 1305 (App.1997). Similarly, re-

---

**27.** Valentine had testified on direct examination that she had seen Freitas and Blaisdell together at approximately 5:30 p.m. Defense counsel was attempting to impeach Valentine with a prior inconsistent statement.

cross-examination should be limited to the scope of redirect examination, *see, e.g., State v. Jones,* 47 P.3d 783 (Kan.2002) (holding that trial court did not abuse its discretion in sustaining prosecution's objection to recross-examination as beyond the scope of redirect); *Brumelow v. State,* 239 Ga.App. 119, 520 S.E.2d 776, 782 (1999) (finding no abuse of discretion in prohibiting counsel from questioning witness on recross-examination regarding matter beyond the scope of redirect examination), or "matters affecting the credibility of the witness," *see, e.g., Simmons v. State,* 552 So.2d 268, 269 (Fla.Dist.Ct.App. 1989) ("A witness's credibility is 'always a proper subject of cross-examination.' . . . This principle holds true in the context of recross-examination." (Citation omitted.)).

In the present matter, Cornelio testified on direct examination that he had been convicted of a theft and a forgery charge, but the subject was not covered during redirect examination. Consequently, because the prosecution did not address the subject of an alleged "second" forgery conviction on redirect, when Cordeiro's defense counsel raised the subject on recross-examination, it was, technically, beyond the scope of redirect, and the circuit court did not err in sustaining the prosecution's objection on this basis. While it is true that the credibility of a witness is always relevant, Cordeiro's defense counsel failed to argue as much when the circuit court ruled that the question was beyond the scope of redirect. "[A] ruling admitting or excluding evidence cannot be assigned as error unless . . . the court is clearly apprised of the nature of the claimed error and of the corrective action sought." Commentary to HRE Rule 103(a).[28] Thus, we cannot say that the circuit court erred in sustaining the prosecution's objection.

■ Assuming *arguendo,* however, that the circuit court did err, the error was harm-

less. Defense counsel was able to impeach Cornelio's credibility with a plethora of convictions, including one forgery conviction. And, in fact, defense counsel was clearly successful in undermining Cornelio's credibility, because Cordeiro was acquitted of the attempted first degree murder charge in the Cornelio case.

Cordeiro's only argument is that, while the jury may not have believed Cornelio's testimony regarding Cordeiro's attempt to hire him to kill Freitas, it may have believed Cornelio's testimony regarding what Cordeiro had told him about the Blaisdell case. Cordeiro does not, however, cite the specific testimony pertaining to the Blaisdell case that the jury might have believed, how the testimony might have contributed to his conviction, or why Cordeiro's impeachment of Cornelio with a "second" forgery conviction might have changed the jury's assessment of Cornelio's credibility. Cornelio's only testimony regarding the Blaisdell case that we can find was that Cordeiro had told him that Freitas was the principal witness for the prosecution in his murder trial. Even if the jury believed the foregoing testimony, we fail to discern how it could have prejudiced Cordeiro.

### 3. *Iona's map*

■ Third, Cordeiro contends that the circuit court erred in sustaining the prosecution's objection to the relevance of the location of the repository in which Iona kept the "second" map that he received from Cordeiro indicating the site of Freitas's home. Cordeiro suggests that "[f]inding out where or who [Iona] gave the map to was an effective and proper method of cross-examination. Especially if the person who Iona claimed was holding the map could be subpoenaed and brought to court and then denied Iona's claims." [29] The prosecution argues that the

**28.** HRE Rule 103(a) provides in relevant part:

 (a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

 . . . .

 (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or

was apparent from the context within which questions were asked.

**29.** During the bench conference following the prosecution's objection, defense counsel argued in relevant part as follows:

 [Defense counsel:] . . . . If this witness were in possession of contraband during that two-year period, it would have been confiscated

specific place in which Iona kept the map was irrelevant and, even if it was relevant, any error was harmless beyond a reasonable doubt.

▄ We agree with the prosecution that the location in which Iona kept the "second" map given to him by Cordeiro was not relevant. The chain of custody of the map might have been highly relevant for purposes of challenging its authenticity during voir dire, but Cordeiro did not challenge the receipt of the map into evidence based on its authenticity. Consequently, for purposes of determining whether the place in which the map was kept was relevant, we must determine whether location had "a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." HRE Rule 401. Cordeiro does not propose how the location of the map made the existence of any fact more or less probable. He simply suggests that his defense counsel might hypothetically have been able to impeach Iona based upon his answer to the question. But almost any testimony could potentially be used to impeach a witness in that fashion; a purely speculative answer to an otherwise irrelevant question does not bootstrap the question into relevance. Accordingly, the circuit court did not err in sustaining the prosecution's objection to the relevance of defense counsel's inquiring into the repository in which Iona secreted the "second" map.

In sum, we hold that the circuit court did not abuse its discretion in limiting the scope of Cordeiro's defense counsel's cross-examination, insofar as the circuit court merely excluded irrelevant and repetitious questions

---

by—it could have been confiscated by MCCC authorities.

Since it was apparently not confiscated during this two-year period, my argument would be it was not in the possession of this witness for that two-year period, and it was created after January or March of '95. Therefore, his hiding place would be relevant as to the believability of the hiding place.

. . . .

Your Honor, for example, if an ACO was holding it for him that would be highly relevant. I would have opportunity to call that ACO in and what are you holding this for him.

[Circuit court:] What's the relevance?

---

by defense counsel and the exclusions did not result in any "manifest prejudice" to Cordeiro.

### G. The Admission Of Cornelio's Testimony Regarding His Religious Beliefs Did Not Violate HRE Rule 610.

▄ Cordeiro argues that the circuit court erred in permitting the prosecution, notwithstanding his objection, to elicit testimony regarding Cornelio's religious beliefs. We disagree.

HRE Rule 610 provides in relevant part that "[e]vidence of beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." There is no prohibition, however, against the admission of evidence of a witness' religious beliefs for other purposes.

In the course of examining Cornelio regarding his decision not to murder Freitas, the following colloquy transpired:

[Prosecution:] Were you going to [murder Freitas]?

[Cornelio:] No.

[Prosecution:] Why not?

[Cornelio:] Changed my life. I not into that thing.

. . . .

[Prosecution:] How has your life changed? What is different?

[Cornelio:] Lots of things, lot of things.

[Prosecution:] Like what? What's most significant do you think?

---

[Defense counsel:] If he was not holding it for him—

[Circuit court:] All you are doing then is impeaching his credibility. It is not relevant.

[Defense counsel:] Exactly.

[Circuit court:] It is not relevant

[Defense counsel:] Credibility is always relevant, your Honor.

[Circuit court:] You can bring anything in you want that has nothing to do with this case and see if he is telling the truth? I don't think that is relevant.

[Defense counsel:] It goes to his credibility. It is also relevant because if the—I made my record.

[Cornelio:] I walk with Jesus Christ as a Christian.

. . . .

[Prosecution:] Mr. Cornelio, how has your life changed due to your Christianity, your faith?

. . . .

[Cornelio:] My belief is that I walk the straight and narrow, cannot be on my conscience all these things been happening. What to me most important is that I know how all victims feel because of what happened to me. I know how all the people we hurt. I know how they feel now because I was hurt real bad.

. . . .

[Prosecution:] Had you formulated your religious beliefs prior to contacting the police in October of 1995?

[Cornelio:] Yes.

[Prosecution:] Was that why you contacted Detective Kaya?

[Cornelio:] Yes.

It is therefore apparent that the prosecution did not inquire into Cornelio's religious beliefs for the purpose of enhancing his credibility.[30] To the contrary, the prosecution was obviously seeking to establish why it was that Cornelio did not, in fact, murder Freitas. Accordingly, we hold that the circuit court did not err in allowing Cornelio to testify regarding his religious beliefs.

H. *The Circuit Court Did Not Err In Denying Cordeiro's Motion For A New Trial.*

■ Cordeiro insists that the circuit court erred in denying his motion for a new trial on the basis that Freitas had, with the deputy prosecuting attorneys' (DPAs) knowledge, perjured himself during his testimony. We disagree.

■ HRPP Rule 33 provides in relevant part that "[t]he court on motion of a defendant may grant a new trial to him if required in the interest of justice." When a defendant seeks a new trial on the grounds that a prosecution witness gave false testimony at

trial, the trial court must first determine whether "it is reasonably satisfied that the testimony at trial of a material prosecution witness [was, in fact,] false." *State v. Teves,* 5 Haw.App. 90, 96, 679 P.2d 136, 141 (1984) (citing *State v. Meafou,* 67 Haw. 41, 677 P.2d 459 (1984)).

In the present matter, the circuit court conducted a hearing on Cordeiro's motion for a new trial on August 26, 1998. At the hearing, Arthur F. Bergquist, the only witness called in the proceeding, testified that, on July 14, 1998, while working at the Maui courthouse in which Cordeiro's trial was held, two unidentified women stated to him that they had overheard a conversation between two men, whom Bergquist presumed were the DPAs, in which one told the other that Freitas was lying on the witness stand. Bergquist did not know the identity of the women, was unable to describe them in any detail, and acknowledged that he would not recognize them if he were to see them again. Moreover, he was unable to state that the women were, in fact, referring to the DPAs.

In light of the fact that Cordeiro was unable to adduce any substantial evidence that Freitas had, in fact, perjured himself during his testimony, we hold that the circuit court did not err in denying Cordeiro's motion for a new trial.

I. *The Circuit Court Did Not Err In Denying Cordeiro's Motions For A Mistrial On The Basis Of Prosecutorial Misconduct.*

■ Cordeiro claims that prosecutorial misconduct, including comments during closing argument regarding the credibility of witnesses and Cordeiro's drug use, frivolous objections, and simultaneous arguments by the two DPAs, cumulatively denied him his right to a fair trial. Accordingly, he argues that the circuit court erred in denying his two motions for a mistrial. We disagree.

1. *The DPA's closing argument was not improper.*

■ It is generally recognized under Hawai'i case law that prosecutors are

---

**30.** As noted *supra* in section III.F.2, Cordeiro successfully impeached Cornelio's credibility in

any event.

bound to refrain from expressing *their personal views* as to a defendant's guilt or the credibility of witnesses. [*State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986)].

However, a prosecutor, during closing argument, is permitted to draw reasonable inferences from *the evidence* and wide latitude is allowed in discussing *the evidence.* [*State v.*] *Apilando*, 79 Hawai'i 128,] 141–42, 900 P.2d [13[135],] 148 [ (1995) ] (citing *State v. Zamora*, . . . [247 Kan.684], 803 P.2d 568 ([Kan.] 1990)) (other citations omitted). It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on *the evidence* as well as to draw all reasonable inferences from *the evidence.*

. . . .

> *Comments to the effect that a defendant or a defense witness were lying have repeatedly been upheld. A prosecuting attorney may comment on the evidence and the credibility of witness[es] and, in the process, may belittle and point to the improbability and untruthfulness of specific testimony.*

[*State v. Weaver*, 912 S.W.2d 499, 513 (Mo. 1995) ] (citation omitted).

*State v. Clark*, 83 Hawai'i 289, 304–05, 926 P.2d 194, 209–10 (1996) (some citations omitted) (some brackets added and some in original) (emphases added).

Thus, in *Marsh*, 68 Haw. at 660–61, 728 P.2d at 1302, we held that it was prosecutorial misconduct for the DPA to repeatedly express her *personal opinion* that the defense witnesses had lied. For example, the DPA exhorted the jury in closing argument, *inter alia*, that "[l]adies and gentlemen, *I feel it is very clear* and *I hope you are convinced, too*, that the person who committed this crime was none other than Christina Marsh" and "[y]ou should entirely disregard [the defendant's alibi witnesses'] testimony because, if you will remember, every one of them lied on the stand. . . . *I sincerely doubt* if [one of the alibi witnesses] had seen Christina Marsh there" and "*I find that awfully hard to believe.*" *Id.* at 660, 728 P.2d at 1301 (emphases added). By contrast, in *Clark*, 83 Hawai'i at 304–05, 926 P.2d at 209–10, we held that it

was not prosecutorial misconduct for the DPA to argue during closing argument that, " '[w]hen the defendant comes in here and tells you that he was not on cocaine that night, that just—it's a cockamamie story and it's asking you to take yourselves as fools[.]' " (Brackets in the original.)

In the present matter, Cordeiro points to a number of instances during the prosecution's closing argument in which the DPA suggested that certain witnesses, including Cordeiro, were lying, while others were being truthful. Cordeiro has failed, however, to cite any example, as in *Marsh*, of the DPA expressing his *personal* views regarding Cordeiro's guilt or a witness' credibility. Nor can we find any. Rather, as in *Clark*, the DPA argued, based on the conflicting evidence presented at trial (*e.g.*, Cordeiro's whereabouts at the time of Blaisdell's murder), that the testimony of Cordeiro and his alibi witnesses was untruthful and that the reliable evidence corroborated the testimony of Freitas and others. The foregoing argument is permissible under our holding in *Clark*. Consequently, the DPA's references to the credibility of certain witnesses was not improper.

■ Cordeiro also argues that the DPA improperly emphasized Cordeiro's drug use in his closing argument. Specifically, he cites the following comments of the DPA:

> Let's look at the defendant. Let's look at his credibility. . . .

> How? Think about his testimony. His first approach, Friday, flat out denial. "No. They must be lying. I didn't do it. I don't do drugs. I don't deal drugs."

> Second approach, Monday, big change over the weekend. Now, "Yeah, okay. I do drugs. I deal drugs, but my memory is not so good. It's a long time ago. I can't be held accountable for every detail."

> . . . .

> . . . He flat out denies on Friday that he told me that he was splitting a load of batu with Shane Shirota. What he tells us on Monday is that, "You know, the reason I said that, I thought it was really cocaine that we were splitting, not batu."

Once again, the DPA's line of argument was not improper; in substance the DPA was merely seeking to impeach Cordeiro's credibility by highlighting his changes in testimony over the course of the trial.

2. *The prosecution's conduct during trial did not amount to prosecutorial harassment.*

Next, Cordeiro argues that certain prosecutorial acts occurring during trial rose to the level of prosecutorial misconduct. Specifically, he complains: (1) that the DPA frivolously interrupted defense counsel while he was laying a foundation for impeaching Freitas, and "again when defense counsel tried to ask Iona whether he was dealing drugs with Kekiwi[,]" (2) that the two DPAs "would argue in tandem or join in each other's arguments," and (3) that the prosecution failed to provide him with the names of its rebuttal witnesses. Cordeiro contends that the foregoing conduct—both separately and cumulatively—prejudiced his right to a fair trial. We address each of Cordeiro's contentions in turn.

■ First, the trial transcript reveals that, during defense counsel's cross-examination of Freitas, the DPA asked to approach the bench, whereupon he complained to the trial judge, outside the hearing of the jury, that defense counsel was not properly impeaching the witness and, consequently, that the prosecution was uncertain of the particular statements that defense counsel was attempting to impeach. Regardless of the merits of the prosecution's objection and the propriety of defense counsel's method of impeachment, following the bench conference, defense counsel was able, without any unwarranted interruptions, to resume cross-examination and impeach Freitas with a prior inconsistent statement that he had made to the grand jury. Thus, assuming *arguendo* that the prosecution's objection was without merit, it did not prejudice Cordeiro's right to a fair trial.

Second, contrary to Cordeiro's assertion, the prosecution did not prevent his defense counsel from questioning Iona regarding his relationship with Kekiwi. Defense counsel

elicited the following testimony concerning Iona's relationship with Kekiwi:

[Defense counsel:] What was your relationship with Doreen Kekiwi?

[Iona:] Drugs.

[Defense counsel:] Pardon?

[Iona:] Drugs.

[Defense counsel:] And when was—you are telling us you were dealing drugs with Doreen Kekiwi, is that what you are trying to tell us?

[Prosecution:] Your Honor, he is being argumentative at this point. Irrelevant, also.

During the ensuing bench conference, defense counsel explained the purported relevance of his question to the circuit court:

This witness told the Maui Police Department police officers Camara and Funes that he believes that Doreen Kekiwi was responsible for the death of Timmy Blaisdell. If this witness believes that Doreen Kekiwi is responsible for the death of Timothy Blaisdell, I believe that I should be able to get into cross-examination of his opinion under Rule 701 that he believes that Doreen Kekiwi is responsible for the death of Timothy Blaisdell.

After listening to defense counsel's argument, the circuit court asked, "Why do you need to go into all the background in order to ask a simple question, whether he told the police a simple statement in regards to this particular individual?" To which defense counsel responded, "If the Court would rather not lay that foundation, or not have me lay that foundation, that would be fine, and that would be directly to [the] point." Defense counsel then resumed cross-examination and was able to elicit Iona's speculation regarding Kekiwi's involvement in the Blaisdell murder. Thus, once again, assuming *arguendo* that the prosecution's objection was without merit, it did not in any way prejudice Cordeiro's right to a fair trial.

■ Third, based on our review of the record, we can find only one instance in which DPA Rivera joined in DPA Jenkins's argument without leave of the circuit court. Specifically, DPA Rivera said, "That's right[,]" following a statement made to the

circuit court by DPA Jenkins during a bench conference. In addition, we note that DPA Rivera asked the circuit court for leave to speak, which was granted, on three other occasions during bench conferences.

Rules of the Circuit Courts of the State of Hawai'i (RCCSH) Rule 17(e) (1998), which is unchanged to the present, provides in relevant part that, "[e]xcept by leave of court[,] ... [o]nly one counsel for each party shall ... be heard on any question." Although DPA Rivera should not have said, "That's right," without first requesting leave of the circuit court to speak, we cannot discern how his utterance could possibly have jeopardized Cordeiro's right to a fair trial.

■ Finally, Cordeiro cites no rule or other authority that requires the prosecution to provide the defense with the names of its rebuttal witnesses, nor are we aware of any.[31] Nor does he suggest the manner in which he may have been prejudiced for want of a list of names. We therefore decline to address this point of error.

In sum, we find nothing improper in the conduct of which Cordeiro complains; nor do we believe that it prejudiced Cordeiro's right to a fair trial, either separately or cumulatively. Accordingly, we hold that the circuit court did not err in denying Cordeiro's motions for a mistrial on the basis of prosecutorial misconduct.

## J. Cordeiro Was Not Denied The Effective Assistance Of Counsel.

■ Cordeiro's final point of error on appeal is that he was not afforded the effective assistance of counsel, as guaranteed by the sixth amendment to the United States Constitution.[32]

To prevail on his ineffective assistance of counsel claim, [Cordeiro] must establish that his "trial counsel's performance was not objectively reasonable—*i.e.,* [that it was not] 'within the range of competence demanded of attorneys in criminal cases.' " *Briones,* 74 Haw. [442] at 462, 848 P.2d [966] at 976 [(1993)] (quoting *State v. Kahalewai,* 54 Haw. 28, 30, 501 P.2d 977, 979 (1972)). Thus, [Cordeiro] must ... point to a specific error or omission that "resulted in either the withdrawal or substantial impairment of a potentially meritorious defense[.]" ... *Id.* (quoting *State v. Antone,* 62 Haw. 346, 349 & n. 1, 615 P.2d 101, 104 & n. 1 (1980)). The defendant raising ineffective assistance of counsel need not, however, prove that the alleged error or omission redounded to his or her " 'actual' prejudice." *Id.* at 464, 848 P.2d at 977 (citations omitted). Rather, the determination "whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker." *Id.*

State v. Poaipuni, 98 Hawai'i 387, 394–95, 49 P.3d 353, 360–61 (2002) (some brackets added and some in original).

Cordeiro fashions his ineffective assistance of counsel claim from several of his other points of error on appeal. Specifically, he contends that defense counsel was ineffective because he failed to: (1) oppose the consolidation of the attempted first degree murder cases with the Blaisdell case; (2) file a pretrial motion to dismiss the defective first degree robbery charge; (3) object to the circuit court's jury instructions with respect to the charge of first degree robbery; (4) move for prompt limiting instructions regarding the "other bad acts" evidence and object to the circuit court's inadequate jury

31. HRPP Rule 12.1(b) does require the prosecution to "inform the defendant in writing of the names and addresses of the witnesses upon whom the government intends to rely to establish defendant's presence at the scene of the alleged offense[,]" in the event that the defense notifies the prosecution that it intends to rely upon an alibi defense, but none of the witnesses called by the prosecution on rebuttal testified regarding Cordeiro's presence at "skid row." Cordeiro does not allege that the prosecution failed to provide him with Freitas's name—the only witness who testified as to Cordeiro's presence at the scene of Blaisdell's murder—in advance, or, for that matter, that any other witness called during the prosecution's case-in-chief, as required by HRPP Rule 16(b)(1)(i).

32. The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

instruction regarding that evidence; and (5) adequately apprise himself of Bergquist's testimony regarding the allegation that Freitas was perjuring himself.

As discussed *supra*, in sections III.A, III.B, and III.C, we do not believe that consolidation of the attempted first degree murder cases with the Blaisdell case was improper, that the charge of first degree robbery failed to state an offense, or that the circuit court's limiting instruction regarding "other bad acts" evidence was inadequate or untimely. Consequently, we do not believe that defense counsel was ineffective in these respects.[33] Furthermore, in light of our holding *supra* in section III.A, which vacates Cordeiro's first degree robbery conviction, his claims of ineffective assistance with respect to his first degree robbery conviction are moot. *See, e.g., State v. Silva*, 75 Haw. 419, 438, 864 P.2d 583, 592 (1993) (noting that "a decision on other issues in the appellate court may effectively moot an ineffective assistance claim").

Finally, we do not believe that defense counsel's failure adequately to apprise himself of Bergquist's testimony "resulted in either the withdrawal or substantial impairment of a potentially meritorious defense[.]" Berguist's testimony clearly indicated that he did not possess any information that might have helped Cordeiro, *see supra* section III.H. Thus, defense counsel's failure only served to waste the time of all parties involved, not to withdraw or substantially impair a potentially meritorious defense.

Accordingly, we hold that Cordeiro's claims of ineffective assistance of counsel are either moot or without merit.

## IV. *CONCLUSION*

In light of the foregoing, we (1) affirm Cordeiro's convictions of second degree murder and prohibited place to keep firearm in the Blaisdell case (Cr. No. 94-0522(3)) and attempted first degree murder in the Iona case (Cr. No. 97-0073(3)), (2) vacate Cordeiro's conviction of and sentence for first degree robbery in the Blaisdell case, and (3) remand the' latter for further proceedings consistent with this opinion.

Concurring opinion by NAKAYAMA, J., with whom RAMIL, J., joins.

I agree with this court's holding that the circuit court did not err in failing to instruct the jury that the "victim" of the theft— whether the owner of the property taken or the person against whom the defendant allegedly used force—must be "aware of the theft." Hawai'i Revised Statutes (HRS) § 708-840(1)(b)(i) provides that a person commits robbery in the first degree if, while committing a theft, "[t]he person is armed with a dangerous instrument and [ ] the person uses force against the person of anyone · present with *intent* to overcome that person's physical resistance or physical power of resistance." HRS § 708-840(1)(b)(ii) (1993) (emphasis added). According to the plain language of HRS § 708-840(1)(b)(i), actual overcoming of the victim's physical resistance or physical power of resistance is not required. Rather, the prosecution must prove *intent* to overcome the victim's physical resistance or physical power of resistance. Thus, I agree with this court's reasoning that HRS § 708-840(1)(b)(i) does not require the victim's awareness of the theft.

However, I would like to reiterate my disagreement with this court's holding in *State v. Mitsuda*, 86 Hawai'i 37, 947 P.2d 349 (1997). In *Mitsuda*, this court held that the victim's awareness of the theft is a necessary element according to HRS § 708-840(1)(b)(ii). *Mitsuda*, 86 Hawai'i at 46, 947 P.2d at 358. In my dissent, I explained that the intent to compel acquiescence is an element of HRS § 708-840(1)(b)(ii), rather than the victim's awareness of the theft.

HRS § 708-840(1)(b)(ii) provides that a person commits robbery in the first degree if while committing a theft, "[t]he person is armed with a dangerous instrument and [ ] the person threatens the imminent use of force against the person of anyone who is present with *intent* to compel acquiescence

---

**33.** While the first degree robbery charge failed to name the person Cordeiro was charged with using force against, defense counsel's failure to move for a bill of particulars did not result in "either the withdrawal or substantial impairment of a potentially meritorious defense."

to the taking of or escaping with the property." HRS § 708–840(1)(b)(ii) (1993) (emphasis added). Similar to HRS § 708–840(1)(b)(i), HRS § 708–840(1)(b)(ii) uses the word "intent." The prosecution must prove the perpetrator's *intent* to compel acquiescence, rather than actual acquiescence of the victim. Thus, the victim's awareness is not a required element in both HRS § 708–840(1)(b)(i) and HRS § 708–840(1)(b)(ii).